**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Francisco Humberto NAVARRO–OR-DAS, Jose Jane, Haydee Alvarez De Rodriguez, Andres Felipe Rodriguez-Ortega, Defendants-Appellants.**

**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Andres Felipe RODRIGUEZ–ORTEGA, Defendant-Appellant.**

Nos. 83–5233, 84–5281.

United States Court of Appeals, Eleventh Circuit.

Sept. 10, 1985.

Rehearing and Rehearing En Banc Denied Oct. 21, 1985.

Larraz & Larraz, P.A., Jose J. Larraz, Miami, Fla., for Jose Jane.

Vincent L. Gambale, Juan C. Marrero, Dept. of Justice, Crim. Div., Charles W. Blau, Assoc. Deputy Atty. Gen., Washington, D.C., Carol Wilkinson, Sp. Asst. U.S. Atty., Miami, Fla., for the U.S.

Before RONEY and TJOFLAT, Circuit Judges, and BROWN [*], Senior Circuit Judge.

TJOFLAT, Circuit Judge:

During a six month period in 1977 and 1978, the appellants, Andres Felipe Rodriguez-Ortega, Haydee Alvarez DeRodriguez, Francisco Humberto Navarro-Ordas, Jose Jane, and others [1] obtained over $3 million in fraudulent loans from three Miami, Florida banks. When the fraud was discovered, they were indicted [2] by a federal grand jury and convicted of mail [3] and wire [4] fraud and of conspiring to violate the

John W. Persse, Sarasota, Fla., for Francisco Humberto Navarro-Ordas.

James McMasters, Miami, Fla., John F. Evans, Zuckerman, Spaeder, Taylor & Evans, Richard Strafer, Coral Gables, Fla., for Haydee Alvarez De Rodriguez and Andres Felipe Rodriguez-Ortega.

[*] Honorable John R. Brown, U.S. Circuit Judge for the Fifth Circuit, sitting by designation.

1. The others named in the indictment were Carlos Santos Penin Dominizis (referred to in this opinion as Carlos Penin), Magaly Rodriguez Cintron, and Sara Moreno. Penin was tried with appellants and convicted, but is not a party to this appeal. Cintron plead guilty prior to trial, and Moreno became a fugitive and is still at large.

2. The indictment contained 14 counts. Counts one through seven charged appellants with mail fraud. *See* 18 U.S.C. § 1341 (1982); *infra* note 3. Counts eight through eleven charged them with wire fraud. *See* 18 U.S.C. § 1343 (1982); *infra* note 4. Count twelve charged appellants with conspiring to commit mail and wire fraud. *See* 18 U.S.C. § 371 (1982); *infra* note 5. Count thirteen charged Rodriguez-Ortega with conducting the affairs of a business enterprise through a pattern of racketeering, the acts of racketeering being the mail and wire fraud described in counts one through eleven. *See* 18 U.S.C. §§ 1961, 1962(c) (1982); *infra* note 7. Count thirteen also contained a forfeiture notice, informing the defendant that, if he was convicted of racketeering, the Government would seek forfeiture pursuant to 18 U.S.C. § 1963(a)(1), (2) (1982). Count fourteen charged Jane with making a false statement in a loan application to a bank whose deposits were secured by the Federal Deposit Insurance Cor-

poration. *See* 18 U.S.C. § 1014 (1982); *infra* note 7.

3. 18 U.S.C. § 1341 (1982) provides:
   **§ 1341. Frauds and swindles**
   Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises ... for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

4. 18 U.S.C. § 1343 (1982) provides:
   **§ 1343. Fraud by wire, radio, or television**
   Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire ... communication in interstate ... commerce, any writings ... for the purpose of executing such scheme or

mail and wire fraud statutes by utilizing the U.S. Postal Service and interstate wire communications to obtain the fraudulent bank loans.[5] Rodriguez-Ortega and Jane were convicted of other offenses as well. Jane was found guilty of making a false statement in applying for one of the bank loans;[6] Rodriguez-Ortega was found guilty of racketeering[7] and ordered to forfeit[8] to the United States the sum of $3,203,045.42, the proceeds of his illegal activity.[9]

These consolidated appeals are from appellants' convictions and from the order of forfeiture, respectively. Appellants question the sufficiency of the evidence to support their convictions and several of the trial court's rulings. Concluding that the Government's proof established each of the crimes charged and that appellants received a fair trial, we affirm their convictions. With respect to the order of forfeiture, the Government concedes a possible error in the court's calculation of the amount of Rodriguez-Ortega's liability; accordingly, we remand the order so the error, if any, can be corrected.

## I.

## A.

The fraudulent scheme in this case dates back to 1975, when appellants Rodriguez-Ortega (Andres Rodriguez) and DeRodriguez (Haydee Rodriguez), his wife, traveled to the Netherlands Antilles and organized three banks: First National Mortgage Bank, North American Bank and Trust Company, and Caribbean Mortgage Bank. None of the three ever did any banking business; they were mere corporate "shells." Nonetheless, they played a significant role in the appellants' subsequent crime spree.

With these corporate charters in hand, Andres Rodriguez set out to purchase an

---

artifice, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

5. 18 U.S.C. § 371 (1982) provides:

**§ 371. Conspiracy to commit offense or to defraud United States**

If two or more persons conspire ... to commit any offense against the United States ... and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.

6. 18 U.S.C. § 1014 (1982) provides:

**§ 1014. Loan and credit applications generally; renewals and discounts; crop insurance**

Whoever knowingly makes any false statement or report, or willfully overvalues any land, property or security, for the purpose of influencing in any way the action of ... any bank the deposits of which are insured by the Federal Deposit Insurance Corporation ... upon any application, advance, discount, purchase, purchase agreement, repurchase agreement, commitment, or loan, or any change or extension of any of the same, by renewal, deferment of action or otherwise, or the acceptance, release, or substitution of security therefor, shall be fined not more than $5,000 or imprisoned not more than two years, or both.

7. 18 U.S.C. § 1962(c) (1982) provides:

**§ 1962. Prohibited activities**

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

"Racketeering activity" includes mail fraud and wire fraud as defined in 18 U.S.C. §§ 1341, 1343.

8. Forfeiture was ordered pursuant to 18 U.S.C. § 1963(a)(1), (2) (1982) which, although it has been subsequently amended, see 18 U.S.C.A. § 1963(a)(1) (West Supp.1985), was in force at the time of the district court's order. Section 1963(a) provided:

**§ 1963. Criminal penalties**

(a) Whoever violates any provision of section 1962 of this chapter shall be fined not more than $25,000 or imprisoned not more than twenty years, or both, and shall forfeit to the United States (1) any interest he has acquired or maintained in violation of section 1962, and (2) any interest in, security of claim against, or property or contractual right of any kind affording a source of influence over, any enterprise which he has established, operated, controlled, conducted, or participated in the conduct of, in violation of section 1962.

9. Following the jury's conviction of Rodriguez-Ortega for racketeering, the district judge tried the forfeiture issue.

existing bank in south Florida. He contacted Gonzolo Ruiz, a bank executive he knew in Miami, and broached the idea of going into the banking business together; Rodriguez would own the bank and Ruiz would run it. Ruiz liked the idea, and he and Rodriguez searched the area for prospects. The Northside Bank of Miami was for sale and negotiations ensued. The price proposed by the bank's shareholders, $3.1 million, was beyond the Rodriguezes' resources, however, so a syndicate of local investors was formed to provide some equity capital.

In March 1977, the syndicate, led by Andres Rodriguez, signed a contract to buy the Northside Bank for $3.1 million. The contract called for a $450,000 cash down payment, which was made, and $2.65 million in cash at the closing, which would take place the following February. The Bank of Miami tentatively agreed to finance $1.3 million of this sum on three conditions: (1) after the acquisition Ruiz would become the Northside Bank's chief executive officer; (2) each member of the syndicate would guarantee the $1.3 million loan and pledge his bank stock as collateral; and (3) Rodriguez would pledge as additional collateral his interest in some Puerto Rican real estate which he falsely represented to the Bank of Miami was worth $1 million.[10] The syndicate, and Ruiz, agreed to these conditions, and, in June, the Bank of Miami issued a formal commitment to make the loan.

While they were negotiating this loan commitment with the Bank of Miami, Andres Rodriguez and Ruiz learned that the bank's parent corporation, Bank of Miami Holding Company, wished to sell one of its small off-shore banks, Popular Bank & Trust Co., Ltd., a Cayman Island company.[11] Popular Bank & Trust had been formed to accommodate the Bank of Miami's foreign customers who desired the security of a large American bank but did not want to place their money in an institution domiciled in the United States. Popular Bank & Trust had deposits of approximately $6 million.

Appellant Navarro-Ordas (Navarro), an officer of the Bank of Miami, handled Popular's day-to-day operations from an office located at the Bank of Miami. Navarro received deposits from foreign customers, placing them in Popular's account at the Bank of Miami, and issued in exchange Popular Bank & Trust certificates of deposits (CD's). He had no authority to lend money, except to depositors who provided Popular CD's as collateral. Any other transaction had to be expressly authorized by the president of the Bank of Miami.

Andres Rodriguez decided to buy Popular Bank & Trust to complement the Northside Bank. Rodriguez' plan was to own ninety-five percent of the bank's stock and to give Ruiz the remaining five percent for his efforts in consummating the transaction. On November 15, 1977, they entered into a contract to purchase 100% of Popular's issued and outstanding stock for $150,000, $100,000 to be paid in cash and $50,000 to be paid in the form of a 180-day promissory note executed by the purchasers and secured by a certificate of deposit acceptable to the seller. The closing, as we recite *infra*, took place on February 15, 1978, six days before the closing of the Northside Bank acquisition.

On October 6, 1977, forty days before he executed the contract to buy Popular Bank & Trust, Rodriguez began borrowing substantial sums from that bank. Navarro handled each transaction. The loans were made either to corporate shells Rodriguez had set up or to going business enterprises

---

**10.** Rodriguez represented to the Bank of Miami that he owned 8 acres of land in Puerto Rico and gave the bank an appraisal indicating that the parcel's fair market value was $1 million. In truth, Rodriguez had purchased the land for $120,000; he had not paid for it; and the sellers were in the process of foreclosing the purchase money mortgage Rodriguez had given them.

**11.** Actually, Popular Bank & Trust Co., Ltd. was owned by Popular Bankshares Corporation, a registered Florida bank holding company, which in turn was owned by Bank of Miami Holding Company. For ease of discussion we treat the two holding companies as one.

he controlled. The first loan, for $30,000, was made to Capital National Investment Corporation, a Panamanian company. Rodriguez secured the loan by pledging a $30,000 CD issued by the Fidelity National Bank of Miami. The second loan, dated November 4, 1977, for $200,000, went to Security International Insurance Corporation. It was also secured by a Fidelity National Bank CD. Navarro had no authority to make these loans, even though they were fully secured by genuine CD's, because neither corporate borrower had funds on deposit at Popular Bank & Trust and the loans were not secured by Popular CD's. Nor did Navarro have any authority to make the loans that followed. They, too, were made to non-depositors; moreover, they were "secured" by worthless collateral.

On November 10, Navarro loaned North American Warranty Investment Corporation, a Rodriguez company, $80,000 secured by a CD of one of the Netherland Antilles shells Rodriguez had organized in 1975, North American Bank and Trust Company. Shortly after this loan was made, Carlos Penin, a Rodriguez associate, entered the picture.

Penin was no stranger to fraudulent dealings. In December 1976, he had persuaded Raquel Morales, an acquaintance of his who lived in Venezuela, to purchase $350,000 worth of CD's from the Fidelity National Bank in Miami and to authorize him to reinvest the interest they earned in additional Fidelity National CD's. In April 1977, Penin borrowed $250,000 from Fidelity National Bank and pledged Morales' CD's as collateral. Morales visited Miami unexpectedly on December 19, 1977 and attempted to redeem her CD's. Her attempt was unsuccessful, of course, as they were still serving as collateral for Penin's loan. To get out of his predicament, Penin had to pay off his loan, immediately. He went to Andres Rodriguez, and Rodriguez sent him to Navarro at Popular Bank & Trust. By this time, Penin had joined forces with Rodriguez and Ruiz to purchase Popular.[12] Navarro promptly solved Penin's problem. Popular loaned Penin $350,000, in Morales' name, and took as collateral worthless CD's issued by First National Mortgage Bank, one of Rodriguez' Netherlands Antilles shells. Penin used $253,000 of the loan proceeds to retire his note at Fidelity and gave Rodriguez' Capital Holding Company the rest.

On January 6, 1978, Popular Bank & Trust loaned Capital Holding Company $210,000 and took some Capital stock, which had no discernible value, as collateral. On January 12, Capital Holding Company borrowed an additional $40,000; this time the collateral consisted of a CD issued by Rodriguez' Netherland Antilles shell, Caribbean Mortgage Company. Jose Jane, Andres Rodriguez' brother-in-law and employee, eventually received the proceeds of this loan. Carlos Penin also dealt with Popular Bank & Trust on January 12. He took out a $100,000 loan in Raquel Morales' name and secured it with a valueless First National Mortgage Bank CD Rodriguez gave him. The loan proceeds were deposited to the accounts of two Rodriguez companies: Capital Holding Investment Corporation and North American Warranty Investment Corporation. On January 18, Rodriguez had Navarro loan North American Warranty Investment Corporation $140,000. Again, Rodriguez pledged worthless First National Mortgage Bank CD's as collateral.

On February 15, 1978, Rodriguez and Penin purchased Popular Bank & Trust[13]

---

12. Rodriguez' and Ruiz' contract to purchase Popular Bank & Trust was amended on December 9, 1977 to include Penin as one of the buyers. Penin also joined the syndicate Rodriguez had formed to purchase the Northside Bank.

13. By this time, Popular Bank & Trust had indirectly loaned Rodriguez $896,000. $700,000

came from loans to his shell corporations or going businesses he owned or controlled and $196,000 came from loans Penin obtained. After the February 15 closing, Rodriguez obtained from Popular, in addition to the funds indicated in the text *infra*, $227,000 from checks he wrote on Capital Holding Company's account at Popular. Popular honored the checks even though Capital's account lacked sufficient funds to cov-

and installed Navarro as its president. Ruiz, who was to receive a five percent stock interest for his efforts, declined to participate in the new venture because he had become increasingly uncomfortable about having Rodriguez as a partner. Ruiz did not sever his relationship with Rodriguez, however, for a justifiable reason. The Northside Bank acquisition was to be closed on February 21, and the Bank of Miami's commitment to finance $1.3 million of the acquisition price was contingent upon Ruiz serving as the bank's chief executive officer. Ruiz had promised the Bank of Miami that he would take the job, and he felt obligated to continue.

The closing of the Northside Bank acquisition went forward as scheduled. The syndicate needed approximately $2.65 million to complete the transaction. The Bank of Miami, abiding by its earlier commitment, financed $1.3 million of that amount. Rodriguez provided the balance. Practically all of it came from Popular Bank & Trust; Navarro gave Rodriguez the proceeds of an unsecured loan for $1.3 million to Capital National Investment Company, one of Rodriguez' Panamanian shells. Rodriguez told those present at the closing that he raised the needed funds by mortgaging Kohly Shopping Center, one of his holdings.

Immediately following the closing, the Northside Bank acquired a new board of directors, elected by the syndicate members. Andres Rodriguez, the bank's largest shareholder, controlled the board. One of the board's first acts was to make Ruiz the bank's president; he was given full responsibility for the bank's operations, pursuant to the syndicate's commitment to the Bank of Miami. The board then installed Haydee Rodriguez and Navarro as vice presidents. It was not long before these two vice presidents and Andres Rodriguez got the bank into serious trouble.

In early March, Jose Jane, Rodriguez' brother-in-law, applied to the Northside Bank for a $78,000 loan on behalf of Kohly Motor Credit Corporation, a defunct Rodriguez enterprise, ostensibly for property improvements. He dealt with Ruiz. Jane provided Ruiz with a corporate financial statement falsely showing assets of almost $500,000 and projected income for 1978 and 1979 of $98,000 and $182,000, respectively. Jane apparently knew a great deal about the automobile business, and he impressed Ruiz as a good credit risk. Ruiz submitted Jane's application to the bank's loan committee, composed of Ruiz and the Rodriguezes, and the loan was approved. The loan proceeds were quickly disbursed to Rodriguez entities.

Two and one half months later, Jane applied for a second loan to Kohly Motor Credit Corporation, for $340,000. By this time, substantial animosity had developed between Ruiz and Andres Rodriguez, and the Rodriguezes had appointed Navarro to fill his spot on the loan committee. Ruiz was out of town on his honeymoon when Jane came to the bank, so Navarro handled his loan application. The loan was promptly approved. The professional bank staff, who were loyal to Ruiz, sensed a fraudulent transaction in the making and refused to fund the loan. In fact, they summoned Ruiz back from his honeymoon to handle the situation. Ruiz immediately turned the loan papers over to the bank's attorney. This angered Andres Rodriguez, and he retaliated. He attempted to "pack" the board of directors with his relatives and to fire all of the bank's officers. He even hired guards to take physical control of the bank's facilities.

Rodriguez' action brought on a visit from Florida banking authorities. They conducted an audit and discovered that the bank's financial condition was rapidly deteriorating. To avoid a crisis, the state ordered the Bank of Miami to take control of the Northside Bank.

Meanwhile, Popular Bank & Trust was on the verge of collapsing. When deposi-

---

er them. Rodriguez' son-in-law, Mariano Rivera, cashed $194,000 worth of these checks at the Northside Bank.

966

tors attempted to withdraw their funds, they were met by Navarro's evasive answers and feeble explanations as to why they could not have their money. On one occasion, Navarro told a customer that Rodriguez was a "protection man" and would take care of the bank's depositors. The Federal Deposit Insurance Corporation, while auditing the Northside Bank, concluded that Popular was "affiliated" with Northside because of Rodriguez' joint ownership interests, and it seized Popular's books. Shortly thereafter, Popular Bank & Trust closed down.

B.

■ To obtain the bank loans we have described, *supra,* appellants admit they made use of the U.S. Postal Service and interstate wire services, and they do not question that such use was sufficient to implicate the mail and wire fraud statutes as alleged in the indictment. What they challenge in this appeal is the sufficiency of the evidence to establish the other elements of the mail and wire fraud offenses.[14] Accordingly, they ask us to set aside their convictions and to direct the district court to enter judgments of acquittal. Alternatively, they seek a new trial, claiming that various trial court errors prejudiced their substantial rights.

II.

Appellants contend that the evidence was insufficient to support their convictions. In assaying the sufficiency of the evidence, we are mindful that the evidence need not have excluded every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt. *United States v. Bell,* 678 F.2d 547, 549 (5th Cir. Unit B 1982), *aff'd on other grounds,* 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983). Rather, we must be convinced that a reasonable jury, viewing the evidence and all reasonable inferences

therefrom in the light most favorable to the government, *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), could find the defendant guilty as charged beyond a reasonable doubt. *United States v. Russo,* 717 F.2d 545, 549 (11th Cir.1983).

■ Employing this standard, we assess the sufficiency of the prosecution's case against each appellant. We begin with Andres Rodriguez. The evidence against Rodriguez was overwhelming as to each charge leveled against him. No point would be served in rehashing the facts we have recited in Part I.A., *supra.*

■ Navarro asserts that he was an unknowing dupe in Andres Rodriguez' fraudulent scheme; hence, he could not have acted with requisite criminal intent. Navarro says that he was no more guilty than his superiors (all indicted) at Popular Bank & Trust who permitted him to make the loans in question. He points out that the Government failed to present credible *direct* evidence that he intended to defraud the bank or its depositors. His argument is spurious; in determining the sufficiency of the prosecution's case, we make no distinction between circumstantial and direct evidence. *United States v. Bell,* 678 F.2d at 549.

■ It is true that Andres Rodriguez may have deceived Navarro in many of their dealings; nonetheless, there was strong circumstantial evidence that Navarro knowingly and willingly participated in Rodriguez' scheme. The jury was entitled to conclude that Navarro, acting on his own initiative, made too many large loans based on fraudulent collateral for his profession of ignorance to be acceptable. Furthermore, Navarro stood to profit personally from the conspiracy: Rodriguez promised him a vice president's job at the Northside Bank and a five percent ownership in Popu-

**14.** Appellants also contend that the evidence was insufficient to support their conviction for conspiring to violate the mail and wire fraud statutes. *See supra* note 2. We do not refer to their contention in our analysis of the evidence, in Part II. *infra,* bearing on the substantive mail and wire fraud charges, but it is obvious from that analysis that the Government fully established the alleged conspiracy and that the point requires no further elaboration.

lar Bank & Trust. That Navarro may have failed to appreciate the extent of Rodriguez' ability to manipulate his associates or the amount of losses that would probably occur was doubtlessly of no moment to the jury, in the face of evidence that he knowingly made worthless loans to Rodriguez, including one for $1.3 million to finance the Northside Bank acquisition, and, in return, got paid a handsome salary.

■ Haydee Rodriguez contends that the jury convicted her only because she was married to Andres Rodriguez. She claims that she knew nothing of her husband's scheme, much less participated in it. The evidence, however, indicated that she played a significant role. The Rodriguezes' bookkeeper testified that Mrs. Rodriguez had an active part in managing the family's business affairs. She worked in the office, handled the books, and shared the decision making with her husband. She frequently determined which shell corporation bank account would be used to pay their bills. Viewed as a whole, the evidence established that she knew that the fraudulent loans we have described helped to finance both bank acquisitions and the family's business ventures.

After the Northside Bank acquisition, Haydee Rodriguez became a vice president of the bank and a member of the board. She had an office at one of the bank's branches where she frequently dealt with customers. The jury could ignore her argument that she played a passive role at the bank and merely followed her husband's instructions. The most persuasive evidence of guilt, to our mind, is that she served on the Northside Bank's three-person loan committee. In this capacity, she approved the fraudulent applications Jose Jane submitted on behalf of a corporation she and her husband controlled for $418,000 in loans. Given her intimate knowledge of the family finances, she must have known that the applications contained false information. The evidence strongly suggested that, had it not been for Ruiz' stubborn independence, she would have looted the Northside Bank's deposits just as her husband looted the Popular Bank's. In sum, there is no basis for disturbing the jury's verdicts against her.

■ The Government's proof consisted primarily of the checks and loan documents evidencing the flow of money from the Popular and Northside banks to bank accounts controlled by Andres Rodriguez. The case against Jose Jane was the weakest because his name infrequently appeared on these documents and because Andres Rodriguez was the principal focus of the prosecution. The evidence did show, however, that Jane worked for Rodriguez, that from one of the Rodriguez' shell companies he received the proceeds of a $40,000 fraudulent loan obtained from Popular Bank & Trust, and that he fraudulently applied for and received from the Northside Bank a $78,000 loan to Kohly Motor Credit Corporation, the proceeds of which went into Rodriguez' coffers. When Jane later applied for another loan to Kohly, Ruiz intervened and the loan did not go through.

In our view, the evidence permitted the jury to find beyond a reasonable doubt that Jane knew of the fraudulent scheme described in the indictment and joined in it willfully, with the intent to pursue its objectives. Moreover, by making the fraudulent loan applications we have cited, Jane took important steps in the achievement of those objectives. His claim that the evidence was insufficient to convict him accordingly fails.

### III.

The Rodriguezes contend that one or more members of the prosecution team in this case improperly disclosed grand jury materials to successive grand juries and to certain state authorities who were examining the bank fraud we have described *supra*. The Rodriguezes moved the district court to dismiss the indictment for this reason, and they requested an *in camera* hearing to establish their allegations. The court denied the Rodriguezes' request and their motion to dismiss; they now claim

this action constituted reversible error. We are not persuaded.

The Rodriguezes, to support their motion, submitted the affidavit of a government attorney, who was conducting another grand jury investigation, to the effect that he had disclosed "certain information gained during his investigation to State authorities who were looking into the Rodriguezes' control of the Northside Bank." They also alleged that another government attorney had "disclosed ... various grand jury documents and records" to a private party engaged in civil litigation against Andres Rodriguez.

In *United States v. Eisenberg*, 711 F.2d 959 (11th Cir.1983), we prescribed the procedure a district court should follow when faced with a *prima facie* showing that the government has improperly disclosed grand jury material. In the case at hand, we do not believe that the Rodriguezes made such a *prima facie* showing.[15] The government attorney's affidavit merely stated that he turned information over to state investigators and private persons whom Rodriguez had defrauded; it did not state that *grand jury* materials were turned over. Government disclosure of information obtained from a source independent of grand jury proceedings does not constitute a violation of Fed.R.Crim.P. 6(e). *In re Grand Jury Investigation*, 610 F.2d 202, 217 (5th Cir.1980).[16]

The district court did not need to inspect the grand jury material *in camera* to determine whether the Rodriguezes' allegations were true if, assuming their truth, the Rodriguezes were not entitled to the relief they requested. "[A] court must consider the nature of the relief requested and the extent to which it interferes with the grand jury process. A criminal defendant who seeks to obtain dismissal of an indictment ... bears a heavy burden in attempting to justify such relief." *In re Grand Jury Investigation*, 610 F.2d at 219 (footnote omitted). We will not disturb the district court's exercise of its supervisory power over the grand jury process or its duty to protect the constitutional rights of the defendant absent an abuse of discretion. *United States v. Pabian*, 704 F.2d 1533, 1537 (11th Cir.1983). The alleged leaks, although perhaps detrimental to the Rodriguezes in civil litigation, simply did not prejudice them in this criminal prosecution. Accordingly, we find no error in the court's refusal to hold an evidentiary hearing to determine whether any grand jury materials were improperly disclosed and its rejection of the Rodriguezes' motion to dismiss the indictment.

## IV.

Andres Rodriguez was convicted in part under the Racketeer Influenced and Corrupt Organizations (RICO) chapter of the Organized Crime Control Act of 1970, 18 U.S.C. §§ 1961–1968 (1982).[17] That law makes it an offense "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate ... commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity...." 18 U.S.C. § 1962(c). The RICO statute also provides that any person convicted under section 1962(c) forfeit to the United States "any interest he has acquired

---

15. The Government's response to the Rodriguezes' motion to dismiss the indictment stated that the district court ordered the disclosure of some grand jury materials pursuant to Fed.R. Crim.P. 6(e), and the entry of these orders is not disputed. We thus read the Rodriguezes' motion as referring to grand jury materials not covered by such orders. For the reasons that follow in the text, we conclude that the Rodriguezes did not make out a *prima facie* case of improper disclosure.

16. In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

17. Certain sections have subsequently been amended. *See* 18 U.S.C.A. §§ 1961, 1963, 1964, 1966 (West Supp.1985).

... in violation of [that] section...." 18 U.S.C. § 1963(a)(1).[18]

Rodriguez was convicted because he conducted an enterprise, consisting of Popular Bank & Trust, the Northside Bank, and various family business ventures and shell corporations, through a pattern of racketeering activity, to wit: the acts of mail and wire fraud alleged in the indictment. The district court determined that, in conducting this enterprise, Andres Rodriguez received $3,203,045.42, the proceeds of the fraudulent loans he arranged, and ordered him to forfeit that amount to the Government. The court provided, in its forfeiture order, that the Government would have a lien on any property of the enterprise in which Rodriguez had invested such loan proceeds and that, in collecting the forfeited amount, the Government should give Rodriguez credit for the fair market value of the lien. The propriety of this provision is not in issue here.

Rodriguez challenges the forfeiture order on several grounds, but only one merits extended discussion:[19] whether the RICO statute authorized the court to order him to forfeit the dollar amount of the loan proceeds he received as "profits" from his racketeering activity. Rodriguez maintains that the Government had a duty to trace those loan proceeds to specific assets he owned at the time the forfeiture order was entered, since only the assets he acquired with the loan proceeds were subject to forfeiture. The Government was able to trace only a small portion of such proceeds.

■■■ At the heart of Rodriguez' argument is the notion that the Congress, in enacting RICO's forfeiture provisions, unwittingly carved out an exception for those who, through carefully crafted subterfuges, are able to "launder" their ill-gotten gains so that they cannot be traced to specific, identifiable assets. We find no basis for such an exception. Under the circumstances presented here, the court could enter what amounted to a personal money judgment against the convicted RICO defendant.

The Supreme Court's decision in *Russello v. United States,* 464 U.S. 16, 104 S.Ct.

---

**18.** *See supra* note 8.

**19.** Rodriguez' other grounds are: (1) the forfeiture order violated Fed.R.Crim.P. 7(c) and denied Rodriguez due process because the Government failed to give him adequate pretrial notice that the Kohly Shopping Center was subject to forfeiture and, in addition, that he might be ordered to forfeit a cash amount rather than specific, identified assets; (2) the forfeiture order must fail because the indictment failed to describe a RICO "enterprise"; it only alleged that the enterprise consisted of a group of corporate entities rather than living persons, as required by 18 U.S.C. § 1961(4); and (3) the forfeiture order's requirement that Rodriguez provide the Government with a financial statement within 20 days to aid in effectuating the order violated his fifth amendment right against self-incrimination and was not authorized by the RICO statute. We reject these grounds, with these brief comments.

Rodriguez' first ground fails because the indictment fairly apprised Rodriguez that his interest in the Kohly Shopping Center, evidenced by his interest in Capital National Investment Corporation, which owned the center and was one of the Rodriguez companies comprising the racketeering enterprise, was subject to forfeiture under 18 U.S.C. § 1963(a)(1), (2). Fed.R.

Crim.P. 7(c) did not require the Government to put him on notice that he might be subject to a cash forfeiture if given loan proceeds could not be traced to specific shopping center assets. Rodriguez' second ground fails because a group of corporations can be a "group of individuals associated in fact" within the meaning of the "enterprise" definition of 18 U.S.C. § 1961(4). *United States v. Huber,* 603 F.2d 387, 396 (2d Cir.1979), *cert. denied,* 445 U.S. 927, 100 S.Ct. 1312, 63 L.Ed.2d 759 (1980). Rodriguez' third ground fails for two reasons. First, the Government was entitled to request, and the district court to order, that Rodriguez provide the Government a financial statement, listing his assets, liabilities, and sources of income, to aid in collecting the forfeiture judgment. *See* Fed. R.Civ.P. 69. Rodriguez has never claimed, in the district court, that the fifth amendment precluded the court from granting the Government such relief; moreover, such a claim would be moot if Rodriguez were to pay the money in full before the financial statement is due. A "blanket assertion of [the fifth amendment] privilege is insufficient to relieve a party of the duty to respond to questions put to him...." *SEC v. First Financial Group of Texas,* 659 F.2d 660, 668 (5th Cir.1981). Rodriguez must submit to examination, and, if he wishes to invoke the privilege, raise it in response to specific questions. *Id.*

296, 78 L.Ed.2d 17 (1983), controls this situation by analogy. *See United States v. Conner*, 752 F.2d 566, 576–77 (11th Cir. 1985). The sole issue in *Russello* was whether profits, as opposed to interests in the enterprise itself, were subject to forfeiture (under the same RICO provisions applied by the court below). The Court determined that "Congress intended § 1963(a)(1) to extend beyond an interest in the enterprise" and to reach the sort of "profits and proceeds" Rodriguez garnered in this case. *Russello*, 464 U.S. at ——, 104 S.Ct. at 300–01. As the Court observed,

> [t]he legislative history clearly demonstrates that the RICO statute was intended to provide new weapons of unprecedented scope for an assault upon organized crime and its economic roots. Congress' statement of findings and purpose in enacting [RICO], is set forth in its § 1. This statement dramatically describes the problem presented by organized crime. Congress declared, "It is the purpose of this Act to seek the eradication of organized crime in the United States ... by providing enhanced sanctions and new remedies to deal with the unlawful activities of organized crime.... The provisions of this title shall be liberally construed to effectuate its remedial purposes."

*Russello*, 464 U.S. at ——, 104 S.Ct. at 302 (citations omitted). The Supreme Court reasoned that to limit the district court's forfeiture power to the defendant's interest in the enterprise would be inconsistent with the purposes of the Act:

> The broader goal was to remove the profit from organized crime by separating the racketeer from his dishonest gains. Forfeiture of interest in an enterprise often would do little to deter; indeed, it might only encourage the speedy looting of the infiltrated company. It is unlikely that Congress intended to enact a forfeiture provision that provided an incentive for activity of this kind while authorizing forfeiture of an interest of little worth in a bankrupt shell.

*Russello*, 464 U.S. at ——, 104 S.Ct. at 303.

■ The circumstances before us now are closely analogous to those in *Russello*.

To limit the forfeiture to profits actually traced to assets Rodriguez held at the time the forfeiture order issued would simply provide an incentive for racketeers to engage in complicated financial transactions to hide their spoils. The legislative history leaves no doubt that, in the view of Congress, the economic power organized crime enjoys is derived from its huge illegal profits. To carry out Congress' intent, a court must order forfeiture of the amount of the profits and place the burden of satisfying the order on the convicted defendant, regardless of what he may actually have done with his profits. To do otherwise "would mean that '[w]hole areas of organized criminal activity would be placed beyond' the reach of the statute." *Russello*, 464 U.S. at ——, 104 S.Ct. at 301 (quoting *United States v. Turkette*, 452 U.S. 576, 589, 101 S.Ct. 2524, 2531, 69 L.Ed.2d 246 (1981)). In fashioning the forfeiture order in this case, the district court followed the spirit, if not the letter, of the law. *United States v. Conner*, 752 F.2d at 576–77.

■ In briefing this appeal, the Government discovered what it believes to be a minor error in the district court's calculation of Rodriguez' racketeering proceeds. Although the Government has not brought the matter to the district court's attention, it now believes that the amount of the order should be reduced by $262,012.35, to $2,940,984.10. Thus, the case should be remanded to the district court for the limited purpose of adjusting the amount of the forfeiture order.

### V.

We have considered appellants' grounds for reversal and find that none warrants the relief they seek. Some of their grounds lack sufficient substance to merit any discussion. Accordingly, appellants' convictions in No. 83–5233 are AFFIRMED. In No. 84–5281, the case is REMANDED for the limited purpose of reconsidering the amount of the forfeiture order.