[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 23-12062

Non-Argument Calendar

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

DEMPSEY EMMANUEL GILMORE,
a.k.a. Dempsey Emmanuel Gilmore Fortson.

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 8:22-cr-00258-WFJ-JSS-1

_____

Before ROSENBAUM, LAGOA, and WILSON, Circuit Judges.

PER CURIAM:

Dempsey Gilmore appeals his convictions and total sentence of 360 months' imprisonment for drug-trafficking and gun crimes. He contends that the district court erred by denying his motion to suppress, denying his motion for judgment of acquittal based on the sufficiency of the evidence, and applying an obstruction-of-justice enhancement at sentencing. After careful review of the record and the parties' briefs, we reject these arguments and affirm Gilmore's convictions and total sentence. But we *sua sponte* vacate the sentence on one count and remand with instructions to bring the sentence into compliance with the statutory maximum.

**I.**

On February 9, 2022, Gilmore was the passenger in a vehicle that fled from an attempted traffic stop. During the high-speed pursuit that followed, Gilmore discarded from the passenger window about five pounds of marijuana, 191 grams of high-purity methamphetamine, and a handgun. A helicopter unit followed the car to a Tampa residence, where Gilmore and the driver, Elvis Martin, fled inside. Officers obtained a warrant to search the residence and took Gilmore and Martin into custody. In the search, officers seized cash, drugs, guns, and surveillance-related equipment, in the form of two digital video recorders ("DVRs") and two SD memory cards containing surveillance footage of inside and outside the home.

A grand jury returned a superseding indictment charging Gilmore with conspiracy to possess and possession with intent to distribute methamphetamine (50 grams or more) and marijuana (less than 50 kilograms), *see* 21 U.S.C. §§ 841(a)(1), (b)(1)(A), (D) & 846 (Counts One & Two); possession of a firearm in furtherance of a drug-trafficking crime, *see* 18 U.S.C. § 924(c) (Count Three); and possession of a firearm as a convicted felon, 18 U.S.C. §§ 922(g)(1) & 924(a)(2) (Count Four).

## A. Motion to Suppress

Gilmore moved to suppress evidence of the contents of the DVRs and SD cards. He argued that these items were not described in the search warrant presented at the time of the search, and that their incriminating nature was not immediately apparent because officers had to review any data they contained.

The district court held a suppression hearing, where testimony established the following. Using an electronic warrant system, Detective Taylor Hart applied for a warrant to search the house for marijuana, methamphetamine, and "items described in Exhibit A." The items described in Exhibit A included "electronic equipment," such as "surveillance equipment," as well as "SD cards and any contents therein." A county judge approved the warrant, authorizing a search for "MARIJUANA/METHAMPHETAMINE and items described in Exhibit A, which is incorporated by reference and made a part hereof as if repeated in full."

In executing the search warrant, Hart presented to the residents a copy of the warrant, but not the underlying affidavit or

Exhibit A.   Inside the residence, officers observed surveillance equipment in plain view.  That equipment included two cameras—one in the living room angled toward the front door and one on top of the kitchen cabinets facing the back door—and two DVRs connected to monitors that showed live surveillance of inside and outside the house.  The officers seized the DVRs and the cameras' SD cards, which they believed would help identify the persons involved in the high-speed chase.  Officers obtained a second warrant to view the contents of these storage devices.

At the conclusion of the hearing, the district court orally denied the motion to suppress.  In doing so, the court made two key findings: (1) Exhibit A was presented to the judge who authorized the warrant, so "it was part of the warrant" and covered the "digital stuff" at issue; and (2) even assuming officers were required to present a copy of Exhibit A to the residents at the time of the search, which the court doubted, that "technical violation" did not warrant suppression because the surveillance items were subject to seizure under the plain-view doctrine.

## B.  Trial

At a two-day jury trial in March 2023, the government's witnesses testified about the events on February 9, 2022.  As relevant here, the evidence showed that Gilmore was the passenger in a Dodge Charger that fled at high speeds from a traffic stop for running a stop sign.  Tracking the Charger in a police helicopter, officers observed, using a thermal camera, items being thrown from the

passenger window after the Charger briefly pulled to the side of the road, partially hidden by a tree.

Minutes later, officers responded to the scene of the discarded items and found the following: (a) a cardboard box with six bags of marijuana, some vacuum sealed and some not, totaling around five pounds; (b) a Gucci satchel containing 191 grams of methamphetamine, a loaded .45 caliber handgun, and a small brown bag labeled "Dempsey"; and (c) a small digital scale. In the Gucci bag, the methamphetamine was divided among ziplock bags. One ziplock bag held 19 mini blue bags containing amounts consistent with street-level sales (roughly 0.5 grams), while seven other ziplock bags held larger quantities in bulk (between 24 and 30 grams each).

A government witness testified that the smaller blue bags were "street users' quantities of methamphetamine," while the larger bags were for "potentially selling to somebody else that's going to distribute further." The drugs, gun, and scale together, the witness testified, were indicative of someone involved in the distribution of marijuana and methamphetamine. Gilmore's fingerprint was found on the exterior of the passenger side front door of the Charger, but no usable fingerprints were found on the other items.

Meanwhile, the helicopter unit continued pursuing the Charger and watched it park in a residential backyard. Wearing a fishing vest, Gilmore fled the Charger on foot with Martin, jumping a fence and running towards a nearby house, where they entered the back door. During the execution of the search warrant,

6                    Opinion of the Court                    23-12062

officers found Gilmore's vest in a bedroom dresser drawer.  The vest's pockets contained three bags of marijuana, totaling 67 grams.

After the government's case-in-chief, Gilmore moved for judgment of acquittal under Federal Rule of Criminal Procedure 29.  He argued that there was no evidence that he "conspired with any person," and that there was no forensic evidence tying him to the substances and gun discarded from the Charger.  The district court denied the motion, and the defense called one witness.  Then, after being instructed by the court, the jury found Gilmore guilty on each count.

## C. Post-Verdict Outburst

The guilty verdict triggered an outburst from Gilmore.  The trial transcript depicts the following events once the verdict was read and the jury polled[1]:

> THE COURT [speaking to the jury]: You've served your country. Thank you from everybody here. Thank you very much. Have a good day.
>
> (Judge Jung exited courtroom.)
>
> THE DEFENDANT: You all got me -- took my mother fucking every single one of my kids.  I got four

---

[1] The government's brief states that the transcript "did not capture everything Gilmore said that day."  And in fact, based on these events, Gilmore was charged with and pled guilty to threatening to assault or kill the prosecutor, in violation of 18 U.S.C. § 115(a)(1)(B). *See United States v. Gilmore*, No. 8:23-cr-151 (M.D. Fla. Aug. 14, 2024).

of them.  Man, I ain't never going to see them again. I want y'all to know I ain't never going to see them again.  Y'all not the only judges.  I just want you to know only God the judge.  He's gonna come right, I'm telling you, man.  Y'all just took all my kids, every single one of them.  You people don't even know me, man.  I'm telling you, man.

(Screaming in the gallery.)

THE DEFENDANT: Man, let my arm go, man, because I ain't got nothing to live for.  I got nothing to live for.

(Defendant taken out of the courtroom.)

(Judge Jung entered courtroom.)

THE COURT: Just for the record, Mr. Dempsey has waived his presence by his conduct, and I need to adjudicate him guilty.  So I do hereby adjudicate him guilty on the verdict.

With that, the proceeding concluded.

*D. Sentencing*

Gilmore's presentence investigation report ("PSR") recommended a guideline range of 262 months to 327 months based on a total offense level of 34 and a criminal-history category of IV, plus a mandatory consecutive sentence of at least 60 months.  The PSR set the base offense level at 32, based on drug quantity, and then added two levels for obstruction of justice under U.S.S.G. § 3C1.1.

Gilmore obstructed the administration of justice, according to the PSR, by "threaten[ing] to kill the prosecutor and the jurors after he was found guilty of the offense," which "required law enforcement to take preventative measures." Gilmore objected that his outburst, while violating courtroom decorum, had no material effect on the jury's verdict or the sentencing proceeding.

The district court overruled Gilmore's objection at sentencing. The court explained that it had observed some of the events before being removed from the courtroom by a court security officer. After the verdict was announced, according to the court, "the defendant stood up, came physically towards the jury or towards the prosecutor's table. He had raised his hands, he raised his voice, he was criticizing or berating the jury. The jury—the lady close to me—was quite startled. She was intimidated. I saw that with my eyes. I make that finding." The court also saw Gilmore "tussling with two marshals," and "his female associate or girlfriend was also yelling," conduct for which the court found Gilmore responsible under § 3C1.1's commentary.

Because of Gilmore's conduct, the district court found, the "appropriate egress of the jury and retirement of the jury was impaired," and the court was delayed by "about 10 minutes" in adjudicating Gilmore guilty. Based on these events, the court found that "the case was impaired, interrupted, obstructed . . . and that one or more jurors was intimidated." The government agreed that Gilmore's conduct impeded the court's ability to accept the verdict and adjudicate him guilty.

After overruling Gilmore's objection, the district court adopted the PSR's guideline range of 262 to 327 months.  Upon hearing from the parties about their views on an appropriate sentence, the court sentenced Gilmore to a total of 360 months in prison, consisting of 300-month concurrent terms for Counts 1 and 2, a 60-month consecutive term for Count 3, and a 121-month concurrent term for Count 4.  The court found the sentence was appropriate "based on the history of recidivism, history of violence, and the seriousness of the underlying conduct."

Gilmore appeals, challenging the denial of his motion to suppress, the sufficiency of the evidence to support his convictions, and his sentence.  We address each issue in turn.

## II.

We apply a mixed standard of review for the denial of a motion to suppress, reviewing the district court's factual findings for clear error and its legal conclusions *de novo*.  *United States v. Thomas*, 818 F.3d 1230, 1239 (11th Cir. 2016).

The record shows that the warrant as authorized by the county judge permitted officers to search for "items described in Exhibit A," which was "incorporated by reference" and made part of the warrant "as if repeated in full."  The court made a finding that Exhibit A was included in the warrant application submitted to and approved by the judge.  And the items described in Exhibit A included, as relevant here, surveillance equipment and data storage devices.  Thus, the seizure of the surveillance-related DVRs and SD cards fell within the scope of the warrant as authorized, and

Gilmore makes no claim to the contrary. *See United States v. Moon*, 33 F.4th 1284, 1296 (11th Cir. 2022).

Still, Gilmore contends that a constitutional problem arose because Exhibit A was not "attached to the search warrant presented to the owners of the home during the execution of the search warrant," and it was not available to the defense until shortly before the suppression hearing. Because Exhibit A was not present at the search, the argument goes, Hart was "unilaterally deciding what items to seize in the search without proper authorization."

We have not addressed in a published opinion whether an incorporated warrant attachment describing items to be seized must be present at the search to validate the seizure of those items.[2]

---

[2] As Gilmore notes, the Supreme Court in *Groh v. Ramirez*, a civil case, indicated that any attachments to the warrant must be both "incorporated by reference" and "*present at the search*" to meet the Fourth Amendment's particularity requirement. 540 U.S. 551, 560 (2004) (emphasis added). But two years later, in *United States v. Grubbs*, the Court stated that an executing officer need not "present the property owner with a copy of the warrant before conducting his search," and that the Fourth Amendment "does not protect an interest in monitoring searches." 547 U.S. 90, 98–99 (2006) (quotation marks omitted). The circuit courts to address similar circumstances since *Groh* and *Grubbs* have concluded that the absence of an incorporated warrant attachment during a search either lacks constitutional significance, *e.g.*, *United States v. Pulliam*, 748 F.3d 967, 973 (10th Cir. 2014) ("[T]he plain language of the Fourth Amendment requires us to focus solely on the warrant as issued to police rather than any copy given to the person or persons targeted by the search."), or does not warrant suppression, *e.g.*, *United States v. Hamilton*, 591 F.3d 1017, 1027–29 (8th Cir. 2010) (holding that the failure to present during the search an

And we need not do so here. That's because we agree with the district court that the surveillance items were permissibly seized under the plain-view doctrine.

"The 'plain view' doctrine permits a warrantless seizure where (1) an officer is lawfully located in the place from which the seized object could be plainly viewed and must have a lawful right of access to the object itself; and (2) the incriminating character of the item is immediately apparent." *United States v. Smith*, 459 F.3d 1276, 1290 (11th Cir. 2006). As the Supreme Court has explained, "[t]he seizure of property in plain view involves no invasion of privacy and is presumptively reasonable, assuming that there is probable cause to associate the property with criminal activity." *Texas v. Brown*, 460 U.S. 730, 738 (1983).

Gilmore challenges the second plain-view requirement only, arguing that the incriminating nature of the DVRs and SD cards was not immediately apparent because officers first had to review the stored data to determine whether it contained usable evidence. But Gilmore misunderstands the scope of the plain-view doctrine.

"[T]he scope of the 'plain view' doctrine extends to the seizure of items that, while not contraband themselves, may be used as evidence against a defendant." *Smith*, 459 F.3d at 1293; *see United States v. Ladson*, 774 F.2d 436, 439 (11th Cir. 1985) ("[I]t must have been immediately apparent that the item was *evidence*, contraband

---

incorporated affidavit listing items to be seized, even if in violation of the particularity requirement, did not warrant exclusion).

or otherwise subject to seizure.") (emphasis added). In *Smith*, for instance, we held that an officer could seize a lockbox of photographs, without reviewing each of the photographs individually, because "he had probable cause to believe that among the photographs, some were illegal." 459 F.3d at 1293.

"A police officer has probable cause to conduct a search when the facts available to him would warrant a person of reasonable caution in the belief that contraband or evidence of a crime is present." *Florida v. Harris*, 568 U.S. 237, 243 (2013) (cleaned up). Probable cause is a "practical and common-sensical standard," evaluated under the "totality of the circumstances." *Id.* at 244.

Here, the officers had probable cause to believe that the DVRs and SD cards, "while not contraband themselves," nonetheless contained surveillance footage that "may be used as evidence against [Gilmore]." *Smith*, 459 F.3d at 1293. Officers executing the search warrant testified that they observed in plain view active video surveillance inside and outside the house. Thus, the officers had probable cause to believe that the storage devices for the surveillance equipment contained video evidence that would help identify the two men observed entering the house after fleeing from a traffic stop. Because the "officers had probable cause to believe the items were connected to criminal activity without viewing their contents," seizure was permitted under the plain-view doctrine. *United States v. Wilson*, 565 F.3d 1059, 1065 (8th Cir. 2009). For this reason, we affirm the denial of the motion to suppress.

**III.**

We review *de novo* the denial of a motion for judgment of acquittal based on sufficiency of the evidence. *United States v. Westry*, 524 F.3d 1198, 1210 (11th Cir. 2008). "We review the evidence presented at trial in the light most favorable to the government, and we draw all reasonable factual inferences in favor of the jury's verdict."[3] *United States v. Bergman*, 852 F.3d 1046, 1060 (11th Cir. 2017).

"If any reasonable construction of the evidence could have allowed the jury to find the essential elements of the crime beyond a reasonable doubt, then we cannot overturn a guilty verdict." *United States v. Colston*, 4 F.4th 1179, 1190 (11th Cir. 2021) (quotation marks omitted). The evidence need not exclude every reasonable hypothesis of innocence for a reasonable jury to find guilt beyond a reasonable doubt. *United States v. Bell*, 112 F.4th 1318, 1331 (11th Cir. 2024). In evaluating evidentiary sufficiency, we make "no distinction between direct and circumstantial evidence." *United States v. Navarro-Ordas*, 770 F.2d 959, 966 (11th Cir. 1985).

Gilmore argues that the evidence was insufficient to establish the conspiracy alleged in Count One. He claims that the government's case rests entirely on his presence in the Charger with

---

[3] The government suggests that Gilmore failed to preserve his sufficiency challenge by renewing his motion for judgment of acquittal after presenting a defense witness, such that our review is only for a "manifest miscarriage of justice." *United States v. House*, 684 F.3d 1173, 1196 (11th Cir. 2012). We need not resolve this matter because we conclude that Gilmore's appeal fails under the ordinary standards for preserved sufficiency challenges.

marijuana and methamphetamine, and that the government failed to present evidence of "any alleged coconspirators," further drug-distribution plans, or fingerprint or DNA matches.  Gilmore also challenges his convictions on the three substantive counts, arguing that the government failed to prove his knowing possession of either the drugs or the gun.

To convict a defendant for conspiracy to distribute drugs in violation of 21 U.S.C. § 846, the government must prove beyond a reasonable doubt that "(1) there was an agreement between two or more people to violate § 841(a)(1); (2) the defendant knew about the agreement; and (3) the defendant voluntarily joined the agreement." *United States v. Colston*, 4 F.4th 1179, 1187 (11th Cir. 2021); *see* 21 U.S.C. § 841(a)(1).  "[T]he existence of a conspiracy may be, and often is, proved by circumstantial evidence, such as inferences from the conduct of the alleged participants or from circumstantial evidence of a scheme." *United States v. Knowles*, 66 F.3d 1146, 1155 (11th Cir. 1995) (quotation marks omitted).  Nonetheless, "reasonable inferences, and not mere speculation, must support the jury's verdict." *Id.* (quotation marks and emphasis omitted).  A defendant's mere presence at the scene of key events or association with a co-conspirator is insufficient to prove membership or involvement in the drug conspiracy, but presence may be a material or probative factor that the jury considers in reaching its decision. *United States v. Miranda*, 425 F.3d 953, 959 (11th Cir. 2005).

"[A] person violates § 841(a) merely by knowingly possessing with intent to distribute a controlled substance." *Colston*, 4

F.4th at 1187 (quotation marks omitted).  A person violates § 924(c)(1)(A) by using or carrying a firearm during and in relation to a drug-trafficking crime, or by possessing a firearm in furtherance of a drug-trafficking crime.  18 U.S.C. § 924(c)(1)(A).  And § 922(g)(1) is violated by knowingly possessing a firearm after having been convicted of a felony.  18 U.S.C. § 922(g)(1).

"To prove knowing possession, the government need only show constructive possession through direct or circumstantial evidence." *United States v. Howard*, 742 F.3d 1334, 1341 (11th Cir. 2014) (quotation marks omitted); *see Colston*, 4 F.th at 1190 ("[A] jury may infer knowledge based on circumstantial evidence.").  "[A] defendant's mere presence in the area of an object or awareness of its location is not sufficient to establish possession."  *United States v. Green*, 873 F.3d 846, 852–53 (11th Cir. 2017) (brackets and quotation marks omitted).  But if the defendant "exercised some measure of dominion or control over the contraband, either exclusively or in association with others, he constructively possessed it."  *United States v. Battle*, 892 F.2d 992, 999 (11th Cir. 1990); *see Howard*, 742 F.3d at 1341.

Here, the district court properly denied Gilmore's motion for judgment of acquittal.  The evidence shows that Gilmore and Martin were in the Charger together with around five pounds of marijuana, 191 grams of methamphetamine, and a gun.  After the attempted traffic stop, both driver and passenger worked together to dispose of the contraband.  When Martin briefly stopped the Charger, officers observed items being thrown from the front

passenger side, where Gilmore was sitting, which strongly suggests that Gilmore was responsible for discarding the contraband. Plus, the Gucci bag with the gun and methamphetamine included a bag with Gilmore's first name on it. The jury also heard evidence that the quantities and packaging of the drugs, the scale, and the gun were indicative of someone distributing marijuana and methamphetamine. In particular, the jury heard that the methamphetamine was packaged in both "street users' quantities" and in larger bags to sell "to somebody else that's going to distribute further." Gilmore and Martin then fled together inside a house, where 67 more grams of marijuana were found in Gilmore's vest.

A reasonable jury could infer from this evidence that Gilmore was not merely present in the Charger with the narcotics, but that he knowingly and voluntarily conspired with Martin or others to possess with intent to distribute marijuana and methamphetamine. *See Colston*, 4 F.4th at 1187; *Knowles*, 66 F.3d at 1155. A reasonable jury could also conclude that Gilmore knowingly exercised dominion and control over the marijuana, methamphetamine, and gun before throwing them from the Charger. *See Howard*, 742 F.3d at 1341; *Battle*, 892 F.2d at 999. Gilmore's disposal of the drugs and his flight from law enforcement suggest he knew he was carrying contraband and sought to avoid detection. *See United States v. Ware*, 69 F.4th 830, 851 (11th Cir. 2023) ("Evidence of flight is admissible to demonstrate consciousness of guilt from which a jury can infer actual guilt.").

Gilmore complains about the lack of physical evidence connecting him to the contraband. But the government was not required to present direct evidence of Gilmore's possession of the contraband, in the form of fingerprints or DNA. The government can sustain its burden of proof with "direct or circumstantial evidence." *Howard*, 742 F.3d at 1341. And "in determining the sufficiency of the prosecution's case, we make no distinction between circumstantial and direct evidence," *Navarro-Ordas*, 770 F.2d at 966, so long as a reasonable jury could "find the essential elements of the crime beyond a reasonable doubt," *Colston*, 4 F.4th at 1190.

For the foregoing reasons, the government presented sufficient evidence, viewed in the light most favorable to the verdict, to permit a reasonable jury to find Gilmore guilty beyond a reasonable doubt of each of the four counts of conviction. We affirm the denial of the motion for judgment of acquittal.

## IV.

Finally, Gilmore maintains that the district court erred in applying an obstruction-of-justice enhancement at sentencing under U.S.S.G. § 3C1.1. When reviewing the district court's imposition of an enhancement for obstruction of justice, we review the district court's factual findings for clear error. *United States v. Massey*, 443 F.3d 814, 818 (11th Cir. 2006).

Under § 3C1.1, a defendant's offense level is increased by two levels if (1) he "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense

of conviction"; and (2) his obstructive conduct related to his offense of conviction and any relevant conduct or a closely-related offense. U.S.S.G. § 3C1.1.  The enhancement is appropriate when, among other circumstances, "a defendant threatens, intimidates, or otherwise unlawfully influences a co-defendant, witness, or juror, directly or indirectly, or attempts to do so." *United States v. Graham*, 123 F.4th 1197, 1291 (11th Cir. 2024) (cleaned up).

In the context of criminal contempt, we have held that a defendant "obstruct[ed] the administration of justice"—"prevent[ing] a court from performing its judicial duty"—by punching his attorney in the face after sentencing and as the district judge was leaving the bench. *United States v. Wright*, 854 F.2d 1263, 1263–64 (11th Cir. 1988).  We explained that "the proceeding had not yet ended" when the defendant struck his attorney, that the "sentencing judge left the bench and recessed the court due to the altercation," and that it was "necessary to restrain [the defendant] in the still occupied courtroom."  *Id.* at 1264.  Thus, the "defendant's actions caused an immediate interruption of the court's business or proceedings," which was sufficient to show that "the administration of justice [was] obstructed." *Id.*

Here, the district court reasonably concluded that Gilmore's post-verdict conduct obstructed the administration of justice.  Similar to the situation in *Wright*, here, the court had not yet excused the jury or adjudicated Gilmore guilty when the outburst occurred, so there was still business before the court.  The court also found, based on its own personal observations, that Gilmore came

physically towards the jury, raising his hands and voice and berating the jury; that at least one juror was intimidated by his outburst; that Gilmore had to be restrained by two marshals; and that the judge was removed from the courtroom for safety. *See Wright*, 854 F.2d at 1264; *see also Graham*, 123 F.4th at 1291. Thus, although the jury had fulfilled its central obligation—rendering a verdict—when the outburst occurred, the record amply supports a finding that Gilmore's "actions caused an immediate interruption of the court's business or proceedings," and so obstructed the administration of justice. *Wright*, 854 F.2d at 1264. We affirm the § 3C1.1 enhancement.

## V.

Before concluding, we note that, although neither party raises the issue, Gilmore's 121-month sentence on Count Four exceeds the statutory maximum. At the time of Gilmore's offense in February 2022, the maximum term of imprisonment for violating 18 U.S.C. § 922(g)(1) was 120 months.[4] *See* 18 U.S.C. § 924(a)(2) (2021).

A district court errs by imposing a sentence beyond the statutory maximum for a particular count. *United States v. Pon*, 963 F.3d 1207, 1241–42 (11th Cir. 2020). In *Pon*, for example, we held that the court erred in imposing concurrent 121-month terms

---

[4] Congress later increased the statutory maximum to fifteen years' imprisonment for violations of 18 U.S.C. § 922(g)(1) committed after June 25, 2022. See Bipartisan Safer Communities Act, Pub. L. No. 117-159 § 12004(c), 136 Stat. 1313, 1329 (2022).

where the statutory maximum was 120 months, even though that issue was not raised by the defendant, and we vacated and remanded for the court to modify the sentence to comply with the statutory maximum for each count. *Id.* at 1242. We noted, however, that the court could make the modification without a full resentencing hearing, because we did not "set aside Pon's 'entire sentencing package' or the time he will remain in prison." *Id.*

Here, like in *Pon*, Gilmore's 121-month sentence on Count Four exceeds the statutory maximum of 120 months. So we vacate the sentence on that count and remand for the limited purpose of modifying the sentence to comply with the statutory maximum. Because Gilmore's total sentence remains unaffected, though, "the modification does not require a resentencing hearing at which [Gilmore] must be present." *Id.*

## VI.

In sum, we affirm Gilmore's convictions, his sentences on Counts One, Two, and Three, and his total sentence of 360 months of imprisonment. We vacate the sentence on Count Four and remand with instructions to modify the sentence.

**AFFIRMED IN PART; VACATED AND REMANDED IN PART.**