[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-13518

_____

D.C. Docket No. 1:18-cr-00304-JB-N-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

LANEESHA COLSTON,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Alabama

_____

(July 13, 2021)

Before GRANT, TJOFLAT, and ED CARNES, Circuit Judges.

GRANT, Circuit Judge:

Laneesha Colston walked into a post office, showed a tracking receipt on her phone, and walked out with a package containing roughly $200,000 worth of cocaine. But law enforcement was already onto her, and officers were lying in wait in the parking lot. As she returned to her car, officers seized the package and arrested her on the spot.

A jury found Colston guilty of two different drug crimes.  She now asks us to overturn that verdict because, according to her, the government never proved that she knew what was inside the package.  But the evidence presented at trial was enough to allow a rational jury to infer that she knew the package contained a controlled substance.  And that is all it takes—knowledge of the specific substance is not required by the relevant statutes or our precedents.

Colston also contends that the district court erred by admitting text messages showing that she illegally sold prescription pills and by instructing the jury on a deliberate ignorance theory.  But the court acted within its discretion when it admitted evidence of Colston's prior drug deals to show that her involvement in a different drug-related crime was not a mistake.  And any error in instructing the jury on a deliberate ignorance theory was harmless because the jury heard sufficient evidence of actual knowledge.  We affirm.

I.

Robert Gechijian, a postal inspector in Mobile, Alabama, was suspicious about a package he came across.  It was heavily taped, it came from California (a known source state for illegal drugs), and the sender and recipient had the same last name.  Gechijian decided to pull the package off the initial processing line and run the names and addresses through a law enforcement database.  What he learned confirmed his suspicions: neither of the names on the package was associated with the addresses listed.  But a Jose Eduardo Bravo Rodriguez—also known as "Pancho"—lived at the receiving address in Pensacola and was also associated with the sending zip code in California.  More red flags: the sender paid a "large

2

amount" in cash for postage and wanted the package to arrive in Florida within two days.

Law enforcement obtained a search warrant for the package. Once they opened it, they found two bricks of cocaine inside a tub labeled for protein powder. The bricks weighed about two kilograms—an "extraordinary amount of cocaine" with a street value of roughly $200,000.

Pancho, meanwhile, got nervous when the package failed to arrive on time. He turned to his mechanic's girlfriend, Laneesha Colston, for help tracking it down. Colston was a small-time local drug dealer; she sold prescription pills on the streets of Pensacola.

But Pancho did not entirely hand off matters to Colston—during a three-day period, they sent 67 text messages and had numerous phone calls. After days went by with no word on the package, Pancho decided to act. He told Colston that they should go to the post office in person, together. She agreed, so the next day the pair hit the road to search for the cocaine at two different post offices.

They started at a branch in northern Pensacola. A supervisor there observed that Colston was "very adamant that she needed her package." When it could not be found, Colston became visibly anxious and upset. That anxious behavior stood out to the supervisor.

The pair's next stop was a post office in Myrtle Grove, a nearby suburb. After they complained about the package being late, the supervisor there looked up the tracking information and reported that the package was in Mobile. The news was not well received. Colston, apparently distraught, walked out to the lobby, but

quickly returned to ask if she could drive to Mobile herself to pick it up. The supervisor said yes, though he thought it odd that Colston would drive at least an hour to get a package rather than just waiting a few more days for it to be delivered in the ordinary course.

When Inspector Gechijian received word about Colston's efforts to track down the package full of cocaine, he decided to stage an undercover operation in Mobile. Posing as a mail clerk named Robert Allen, Gechijian called Colston to inquire whether she was still looking for her package. When she answered in the affirmative, "Allen" reassured her that the package was safe in Mobile. He promised her that he would have it delivered to Pensacola, but offered to hold it for her in Mobile if she wanted to come pick it up right away. With no hesitation, Colston said she would be in Mobile the next morning.

While she was still on the phone with "Allen," Colston received a text message from one of her frequent customers, who was missing a pill from his recent drug buy. She quickly replied to her buyer that she would figure out later if she had dropped one of his pills, but told him that he needed to "[h]old up" for now because she was "in the middle of something huge." Colston then turned her attention back to "Allen," and finalized the plans for her trip to Mobile.

As soon as Colston hung up she texted Pancho to fill him in on her call; he replied with a message asking her to relay "precisely" what she had learned from "Allen." Once he heard the details, he reached out to one of his employees, Mario Esteban-Reyes. Pancho asked Reyes, who had already picked up drugs for him nearly a dozen times, to accompany Colston to the Mobile post office. For his

4

part, Reyes knew that Colston was associated with Pancho because he had seen her at Pancho's house twice before. He agreed to go with her.

Early the next morning, Colston, Reyes, and Pancho met up at Pancho's home, where Colston and Pancho talked about plans for picking up the package. After that, Colston and Reyes took off; Colston was behind the wheel. In her rush to get to Mobile, she "drove like a crazy woman," speeding and "swerving from one lane to the other." At one point, Colston even asked Reyes if he was scared.

When the pair arrived at the post office (30 minutes before the scheduled pickup time), Colston went into the lobby, while Reyes waited in the car. After confirming that Colston had the correct tracking number, Gechijian brought out the package and handed it over. Colston, he later reported, was "happy," "joyful," and "extremely elated." But not for long. Once Colston returned to the car, officers arrested her, arrested Reyes, and seized the package of cocaine. As Colston and Reyes were transported to the station, she begged him to "tell the police officers that she had nothing to do" with the crime in hopes that they would "release her soon."

Once they arrived at the station, Colston waived her *Miranda* rights and told the officers her own tale of how she ended up at the Mobile post office. She explained that the man waiting in the car with her was named Carlos Lopez and that he had paid her $150 to translate as he tried to find a missing package. She had done translation work for "Lopez" in the past, she said, describing one instance when she accompanied him to a hospital to deal with a rash. She also falsely reported to the officers that it was Lopez who had gone with her to the two post

5

offices in Pensacola the day before.  When Inspector Gechijian pressed her on whether anyone else was involved, Colston denied it.  And despite "numerous opportunities" to identify other people involved, she never once mentioned Pancho.

Apparently not realizing that the jail recorded inmates' phone conversations, Colston called her boyfriend.  He must not have known either, because he immediately started to shore up the details of her cover story.  He told her that he had talked to "the other person" and clarified with him that she was "only there to translate."  The "other person," he said, had agreed to say the same.  Colston's boyfriend reiterated throughout the call that the "only thing [she was] doing was translating," and he reminded her that she did not "know anything."  Colston confirmed that she understood.  As the conversation progressed to her upcoming court date, the boyfriend repeated his instruction:  "Say that you were only there to translate ok?"  Again, she agreed.  Not yet certain that Colston had gotten the message, at the end of the call he instructed her that the "only thing" she needed to say—"listen to me good"—was that she did not know "him" and was "only there for translation."

The couple talked the next day, and the boyfriend continued to push the same story.  He told Colston she would be in court soon, reminding her to "say that they took [her] over there to translate."  Colston confirmed the approach:  "Yes, only that."  The boyfriend, for whatever reason, was still not satisfied:  "Who took you?  You say that they sent for you.  That you went with that guy and didn't know anyone else."  He ended the call by telling Colston—yet again—that she "didn't

6

even know" Reyes and reminded her that she came to the post office "only to translate."

About a month later, a grand jury returned an indictment charging Colston and Reyes with two drug offenses: knowingly possessing with intent to distribute "a Schedule II controlled substance, to-wit: approximately 2 kilograms of cocaine" in violation of 21 U.S.C. § 841(a)(1) and conspiring to distribute "a Schedule II controlled substance, to-wit: cocaine" in violation of 21 U.S.C. § 846. The indictment also specified that the crimes involved more than 500 grams of cocaine, so the defendants were subject to the higher penalties set out in 21 U.S.C. § 841(b)(1)(B). Reyes pleaded guilty. Colston, however, proceeded to trial on both charges.

Her story that she was just a translator began to unravel as soon as Reyes took the stand. Reyes testified that he had only seen Colston twice before the day of their arrest. Both times were at Pancho's house—and neither time did the two speak to each other at all, much less about translation services. The first time they actually talked, he said, was at Pancho's place on the morning of the Mobile trip, where they made plans for the package pickup, but did not discuss translation services. Reyes also testified that he knew that they were picking up drugs and that Pancho would pay him afterwards. And though Colston had claimed that Reyes was the only one she communicated with about the package, Reyes did not back up that contention either—he testified that the two had never so much as exchanged a phone call or text message. Any communication about the package, he said, went through Pancho.

7

The government's remaining witnesses continued to undermine Colston's story. Post office employees described Colston's anxious behavior as she looked for the package and confirmed that it was Pancho, not Reyes, who accompanied Colston to the Pensacola post offices the day before the Mobile trip. They also reported that Colston spoke to Pancho in English during the visit. A special agent from the Drug Enforcement Agency testified that drug traffickers like to use couriers "that they trust," especially if the drugs are valuable. Colston, the evidence suggested, fell into that category. And Inspector Gechijian relayed the false story Colston told about "Carlos Lopez" after her arrest.

Nor was the documentary evidence in Colston's favor. The jury saw text messages and phone records demonstrating the depth of Colston's role, including how frequently she and Pancho communicated before her arrest. Other text messages from Colston's phone showed her illegally buying and selling prescription pills immediately before and during the charged conduct. Those messages confirmed that she had experience with controlled substances and, according to the government, rebutted the suggestion that Colston's involvement in the charged crimes was a mere accident or mistake.

After the government rested its case, Colston moved for a judgment of acquittal. She argued that the government had failed to prove two essential elements of its case: that she formed an agreement and that she knew the package contained a controlled substance. The court denied her motion, and Colston rested without presenting any evidence of her own.

8

The court then gave final instructions, informing the jury that to hand down a guilty verdict, it would need to find beyond a reasonable doubt that Colston knew the package contained a controlled substance. Over Colston's objection, the court also offered a "deliberate ignorance" instruction explaining that the deliberate avoidance of positive knowledge is the legal equivalent of actual knowledge. According to the instruction, the jury could convict if it determined that Colston (1) actually knew the package contained a controlled substance, or (2) had every reason to know but deliberately closed her eyes to that fact.

After deliberating for a little over an hour, the jury asked the court to explain the difference between the possession and conspiracy counts. The court referred the jury to the appropriate pages of the instructions and deliberations continued, unsuccessfully. The jury returned the next day and, around noon, reported that it could not reach an agreement. The court responded with a modified *Allen* charge—in other words, it asked the jury to keep trying. *See Allen v. United States*, 164 U.S. 492 (1896). A little over an hour later, the jury returned a guilty verdict on both counts.

The district court convicted Colston and sentenced her to concurrent terms of 60 months' imprisonment on each count, followed by five years of supervised release. This appeal followed.

## II.

Our discussion of Colston's claims proceeds in three parts. *First*, we explain the elements of her charged crimes and address whether the evidence presented at trial was sufficient to support her convictions. *Second*, we consider the district

9

court's deliberate ignorance instruction. And *third*, we address the district court's admission of the evidence of Colston's illegal sales of prescription pills.

## A.

Colston contends that the evidence offered to support her convictions was insufficient because the government failed to show that she specifically knew the package contained cocaine. That is a new theory. The district court instructed the jury—without any objection from Colston—that the knowledge requirement was met so long as Colston knew she possessed a controlled substance; she did not need to know that substance was cocaine. Other statements and filings by both sides throughout the trial reflect the same understanding. But that understanding did not last; sometime after trial, the parties seem to have agreed that an essential element of Colston's convictions was that she knew she possessed cocaine, not just a generic controlled substance. In fact, on appeal the government agreed with Colston's counsel that it needed to prove Colston knew she possessed cocaine.

We are not bound by that concession, and we decline to accept it. A party can, at a court's discretion, be held to certain kinds of concessions that counsel makes on appeal, say, about the facts or evidence in a specific case. *See Crowe v. Coleman*, 113 F.3d 1536, 1542 (11th Cir. 1997). Concessions of law, on the other hand, are never binding on us. *Nesbitt v. Candler County*, 945 F.3d 1355, 1357–58 (11th Cir. 2020). The court decides what the law is—not the parties. So we define the elements of Colston's charged crimes ourselves when performing a sufficiency analysis. *See Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 923 (11th Cir. 2018). The statutes that Colston was charged with violating—§§ 841(a)(1), 841(b)(1)(B),

10

and 846—do not require knowledge of the specific substance she possessed. We explain why below. And we also explain that the government presented ample evidence that Colston knew she possessed a controlled substance.

1.

In considering whether the evidence was sufficient to convict, we start by defining the essential elements of the defendant's charged crimes. Here, Colston was charged with knowingly possessing with intent to distribute a controlled substance in violation of § 841(a)(1) and conspiring to commit that offense in violation of § 846. The government sought enhanced penalties for those crimes under § 841(b), which provides for higher penalties based on the type and quantity of drug involved. We will first explain the two substantive statutes and then address how they interact with the penalty provision.

Section 841(a)(1) makes it "unlawful for any person knowingly or intentionally . . . to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, *a controlled substance*." 21 U.S.C. § 841(a)(1) (emphasis added). As the text of the statute shows, a person violates § 841(a)(1) when she knowingly possesses with the intent to distribute illegal drugs of some sort, even if she does not know exactly which controlled substance it is. The Supreme Court has confirmed this reading: "That knowledge requirement may be met by showing that the defendant knew he possessed a substance listed on the schedules, even if he did not know which substance it was." *McFadden v. United States*, 576 U.S. 186, 192 (2015). So have our precedents: "[A] person violates § 841(a) merely by knowingly possessing with intent to distribute a

11

controlled substance." *United States v. Sanders*, 668 F.3d 1298, 1309 (11th Cir. 2012); *see also United States v. Nunez*, --- F.4th ----, ----, No. 19-14181, 2021 WL 2470303, at *9 (11th Cir. June 17, 2021).

To convict a defendant under § 846 for conspiracy to possess with intent to distribute a controlled substance in violation of § 841(a)(1), the government needs to prove beyond a reasonable doubt that (1) there was an agreement between two or more people to violate § 841(a)(1); (2) the defendant knew about the agreement; and (3) the defendant voluntarily joined the agreement. *United States v. Iriele*, 977 F.3d 1155, 1168–69 (11th Cir. 2020). The state of mind necessary for a § 846 charge is the same as that required for a § 841(a)(1) charge: the defendant must knowingly possess, and intend to distribute, a controlled substance, but need not know which substance it is.

Section 841(b), on the other hand, provides the penalties for violations of § 841(a)(1) and § 846—and some of those penalties do depend on the substance, and also on its quantity. *See* 21 U.S.C. § 841(b). For example, § 841(b)(1)(B)(ii) provides for enhanced statutory penalties when a violation of § 841(a)(1) involves 500 grams or more of cocaine.

Those facts have to be charged and proved. The Supreme Court made clear in *Apprendi v. New Jersey* that any fact other than that of a prior conviction that increases the penalty for a crime beyond the statutory maximum must be submitted to a jury and proven beyond a reasonable doubt. 530 U.S. 466, 490 (2000). And in *Alleyne v. United States*, the Court explained that a fact that increases a mandatory minimum "constitutes an 'element' or 'ingredient' of the charged

12

offense" and must be submitted to the jury.  570 U.S. 99, 107–08 (2013).  So under *Apprendi* and *Alleyne*, an indictment must charge—and a jury must find beyond a reasonable doubt—that an offense involved a particular drug type and quantity before a defendant can receive an enhanced sentence under § 841(b)(1).

But unlike § 841(a)(1), § 841(b) has no mens rea requirement.  The § 841(b) penalties are based on only the type and quantity of drug "involved," not on what the defendant knew.  *See Sanders*, 668 F.3d at 1311.  So although a defendant must know that a controlled substance is involved to be convicted under § 841(a)(1) or § 846, the only things that matter for § 841(b) are the type and quantity of the substance; whether the defendant was specifically aware of those facts is irrelevant.  *See United States v. Collazo*, 984 F.3d 1308, 1329 (9th Cir. 2021) (en banc).  In short, when the government charges violations of § 841(a)(1) and § 846, and mentions the specific drug involved to seek enhanced penalties under § 841(b)(1), it needs to prove the defendant's mens rea only for the substantive violation, not for the specific drug charged.

It is true that we departed from this longstanding rule in *United States v. Narog*, 372 F.3d 1243, 1249 (11th Cir. 2004).  But that departure was incorrect, and we have since corrected course.  *See Nunez*, 2021 WL 2470303, at *9.  In *Narog*, we reasoned that the government charged a "subset" of a § 846 crime when it included the identity of the controlled substance in the indictment, and thus needed to prove that the defendants knew the specific drug involved.  372 F.3d at 1249; *see also United States v. Achey*, 943 F.3d 909, 915 (11th Cir. 2019) ("*Narog* teaches that when an indictment contains *both* the broad language of the statutory

13

crime and additional language seemingly narrowing the charged crime to a subset of the statutory crime, the government is required to prove the subset of the crime." (quotation omitted)).  Though earlier cases made clear that knowledge of the specific substance was not required, *Narog* seemed to upset that balance. Defendants have since relied on it to argue that if an indictment is worded just so, we must read it to charge a mens rea for the specific type of drug.

Though *Narog* rarely got defendants where they wanted to go—we've almost always concluded that knowledge of substance need not be proven—the twists and turns it required were a detour in the analysis, and misled defendants about what might be required.  That road has come to a dead end.  We have made clear that *Narog*'s subset analysis, along with its demand for a hyper-technical parsing of every indictment, is not good law.  *See Nunez*, 2021 WL 2470303, at *9.

To explain, a subset crime is not a more specific version of a general crime, as *Narog* would suggest.  Instead, the term "subset offense" is simply another name for a lesser-included offense.  *See, e.g.*, *Schmuck v. United States*, 489 U.S. 705, 716 (1989); *United States v. Whitman*, 887 F.3d 1240, 1247 (11th Cir. 2018); *Narog*, 372 F.3d at 1249.  And a lesser-included offense is one that has elements that are a subset of the elements of a more serious crime.  Say, for instance, that a crime has four elements; a lesser-included offense would be one that includes three of those four elements, and nothing else.  Put differently, each of the elements of a lesser-included or "subset" offense must necessarily be an element of the more serious crime.

14

This lesser-included offense analysis cannot possibly apply to § 841(a)(1) and § 846 in the way that *Narog* suggests. As our precedents show, knowledge of the specific substance is not an element of a § 841(a)(1) offense, let alone of a lesser offense that could be separately charged under a different statute. *See, e.g., United States v. Gomez*, 905 F.2d 1513, 1514 (11th Cir. 1990). The same is true for the conspiracy offense in § 846. So if knowledge of the specific drug is not an element of the statutory offenses in the first place, then a drug trafficking indictment like this one could not have charged a subset crime by including details about the specific drug. *See Nunez*, 2021 WL 2470303, at *9.

All that to say, in these cases the government needs to prove only that a defendant knew a controlled substance was involved, not that the defendant knew what that controlled substance was.

## 2.

That conclusion is fatal to Colston's argument. She contends that the government did not sufficiently prove that she knew the package's contents, apparently conceding that the evidence supported the other elements of her crimes. But after drawing all reasonable inferences in the government's favor, we conclude that the evidence presented at trial was sufficient to allow a reasonable factfinder to infer that Colston knew the package she picked up contained a controlled substance.

Colston's indictment charged her with violating § 841(a)(1) and § 846—neither of which requires knowledge of the specific drug involved. The indictment referenced "cocaine" so that the government could seek enhanced penalties based

15

on the drug type and amount. *See Apprendi*, 530 U.S. at 490; *Alleyne*, 570 U.S. at 107–08. Indeed, the indictment mentioned § 841(b)(1)—the penalty provision—in each count. And that provision carries with it no mens rea requirement. We reject Colston's contention that the government needed to prove that she knew the controlled substance was cocaine.[1]

The question for us is whether the jury had enough evidence to conclude that Colston knew the package contained a controlled substance. We review that question de novo, looking at the evidence in the light most favorable to the government and resolving all reasonable inferences in favor of the verdict. *United States v. Crabtree*, 878 F.3d 1274, 1284 (11th Cir. 2018). If any reasonable construction of the evidence could have allowed the jury to find "the essential elements of the crime" beyond a reasonable doubt, then we cannot overturn a guilty verdict. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

Guilty knowledge can rarely be established directly. But a jury may infer knowledge based on circumstantial evidence. *United States v. Clay*, 832 F.3d 1259, 1309 (11th Cir. 2016). While what is required "varies widely based on the individual facts of each case," we have a few guideposts. *United States v. Wilson*, 183 F.3d 1291, 1300 (11th Cir. 1999). For example, if a defendant was instrumental to a plan's success, had ample opportunities to discover the critical fact, and was in frequent contact with someone who knew that fact, then a jury may be able to infer knowledge. *See id.*; *see also United States v. Duenas*, 891

---

[1] We note for the sake of completeness that even if *Narog* were good law, Colston's indictment would not fall into its narrow exception. The best reading of her indictment makes clear that the word "cocaine" was included only to seek enhanced penalties under § 841(b).

F.3d 1330, 1335–38 (11th Cir. 2018).  False testimony after the fact also points toward a defendant's knowledge.  *See United States v. Hastamorir*, 881 F.2d 1551, 1557 (11th Cir. 1989).

The government insists that the jury could reasonably infer that Colston knew the contents of the package because a "prudent smuggler" would not entrust someone with such a valuable package without telling her what was inside.  *See United States v. Quilca-Carpio*, 118 F.3d 719, 722 (11th Cir. 1997).  Colston pushes back, arguing that she was never fully entrusted with the package because either Pancho or Reyes always accompanied her to the post office.  This back-and-forth, though, is a sideshow—we need not decide whether the prudent smuggler doctrine applies because enough other evidence was introduced to allow a reasonable jury to find the critical element of knowledge beyond a reasonable doubt even without considering that doctrine.

For starters, Colston was in frequent contact with Pancho, who obviously knew what was in the package.  Phone records showed that Colston and Pancho were in contact 169 times during the 30 days before her arrest.  And in just the three days before Colston drove to Mobile, the two were in contact 67 different times about the package.  They also communicated in person, and went to two post offices together to try to track the package down.  Colston even went to Pancho's house the morning of her arrest to discuss the package and meet Reyes.  All that interaction with Pancho means that Colston had ample opportunities to discover the details of the plan—including that it involved a controlled substance.  *See Duenas*, 891 F.3d at 1335 (substantial communications with other co-conspirator

17

supported inference of knowledge).  The jury could easily have inferred that Colston took advantage of those opportunities.

As for Reyes, he confirmed at trial that he knew all along that he and Colston were going to Mobile "to pick up drugs."  Reyes was her partner in crime—it was just the two of them who went to Mobile the day of their arrests.  So a jury could reasonably infer that what Reyes knew about the package, Colston knew too.  *See id.* (defendant's communications with person who knew the transaction's details supported inference of knowledge).

The jury could also infer knowledge based on how instrumental Colston was to the plan's success.  It was Colston, not Pancho, who asked the Florida post office employees about the package's whereabouts.  And it was Colston, not Pancho, who talked to Inspector Gechijian on the phone and immediately agreed to take a trip to Mobile to retrieve the package.  What's more, Colston had a copy of the package's receipt and tracking number stored on her phone—empowering her to take possession of a package containing roughly $200,000 of contraband.  This all suggests that she had the autonomy to obtain the package herself.  *See id.* (defendant's independent and critical participation in the scheme supported inference of knowledge).  So her crucial contributions to the scheme supported the inference that she knew the package contained a controlled substance.

Moreover, ample evidence supports the conclusion that Colston knew she was involved in a criminal plan, and that the package was at the heart of it.  *See Hastamorir*, 881 F.2d at 1557–58.  Inspector Gechijian and other post office employees testified to Colston's extreme behavior when she attempted to find the

package; she was distressed that it could not be found, and anxious enough to drive across state lines to pick it up. While she was in the throes of her search, she texted a customer that she was in the "middle of something huge." Helping a friend pick up a lost package is hardly "huge" in the ordinary scale of life events, so Colston's communication allows for an inference of knowledge. *See Duenas*, 891 F.3d at 1335 (defendant's text message that he was "going to do a special work" demonstrated awareness of the crime).

The evidence does not stop there. After her arrest, Colston concocted a story that was firmly rebutted by the evidence presented at trial. *See Hastamorir*, 881 F.2d at 1557. The evidence showed that Colston had never translated for Reyes before, did not translate for him on that day, and had only communicated with Pancho about the package. And though Inspector Gechijian pressed Colston to identify everyone involved in the crime, she never once mentioned Pancho—even though they were frequently in contact about the package and had been together at his house that very morning.

Finally, the text messages on Colston's phone showing that she illegally sold prescription pills right before her arrest could have allowed a jury to infer knowledge. Those text messages rebutted the suggestion that Colston was not familiar with drug trafficking. *Cf. United States v. Barron-Soto*, 820 F.3d 409, 419 (11th Cir. 2016) (jury could weigh defendant's prior conviction for drug trafficking against any inference that he did not know drugs were in his car). And her involvement in a different drug distribution scheme could allow a jury to infer that she had not gotten involved with Pancho by accident or mistake.

19

To support her argument that the evidence was insufficient to establish knowledge, Colston points out that her text messages with Pancho never used the word "cocaine" and that Pancho and Reyes had used "dupes" in the past by mailing packages of drugs to the residences of unsuspecting neighbors. We agree that those pieces of evidence—taken in isolation——could cut against the government's case. But careful communication is not enough to reverse a verdict. What matters is whether any rational factfinder could have inferred that Colston knew what the package contained. *See Jackson*, 443 U.S. at 319. Examining the sum of the evidence—namely, that Colston was in frequent contact with Pancho, worked closely with someone who admitted that he knew what the package contained, made crucial contributions to the plan, acted suspiciously, lied after she was arrested, and was undeniably familiar with the drug trade—we conclude that a rational jury could have inferred that Colston knew the package contained a controlled substance. The district court did not err in denying Colston's motion for judgment of acquittal.

## B.

Colston next contends that the district court should not have instructed the jury on a deliberate ignorance theory because there was insufficient evidence to support it. But if the jury was instructed on an actual knowledge theory, and the record contained enough evidence to convict on that theory, we need not decide whether the evidence was also sufficient to justify giving a deliberate ignorance instruction. *See United States v. Stone*, 9 F.3d 934, 938 (11th Cir. 1993). We always presume that a jury follows its instructions. *United States v. Brown*, 983

20

F.2d 201, 202 (11th Cir. 1993). So if the evidence presented at trial was sufficient to support one theory but not the other, we presume that the conviction rested on the supported theory. *Stone*, 9 F.3d at 939.[2]

That logic controls here. The court instructed the jury that it could convict if Colston either knew the package contained a controlled substance or kept herself deliberately ignorant of it. So if, as Colston contends, there was insufficient evidence that she was deliberately ignorant of the contents of the package, then our precedent makes clear that the jury must have convicted on the supported theory— actual knowledge. *Id.* at 938. This means that any error in giving the deliberate ignorance instruction was undoubtedly harmless.

C.

Colston also argues that the district court abused its discretion when it admitted evidence of her illegal sales of prescription drugs. To be admissible under Federal Rule of Evidence 404(b), evidence of other acts must (1) be relevant to an issue other than the defendant's character, (2) be sufficiently proven to allow a jury to determine that the defendant committed the act, and (3) satisfy the requirements of Rule 403. *United States v. Nerey*, 877 F.3d 956, 975 (11th Cir. 2017). Colston argues that the text messages showing her illegal drug deals were inadmissible for two reasons: they spoke only to her character, and their probative

---

[2] Colston acknowledges our holding in *Stone* but asks us to "reconsider [our] position." We cannot do that. We are bound to follow a prior panel's holding unless and until it is overruled or undermined to the point of abrogation by the Supreme Court or this Court sitting en banc. *United States v. Gillis*, 938 F.3d 1181, 1198 (11th Cir. 2019).

value was outweighed by the danger of unfair prejudice under Rule 403.  We disagree.

Colston pleaded not guilty, so her intent was a material issue at the trial. *United States v. Matthews*, 431 F.3d 1296, 1311 (11th Cir. 2005).  And evidence of prior drug dealings is "highly probative of intent to distribute a controlled substance, as well as involvement in a conspiracy."  *United States v. Cardenas*, 895 F.2d 1338, 1344 (11th Cir. 1990) (quotation omitted).  In fact, this Court "regards virtually any prior drug offense as probative of the intent to engage in a drug conspiracy"—even if the prior crime involves a different type and amount of drug.  *Matthews*, 431 F.3d at 1311; *see also United States v. Delgado*, 56 F.3d 1357, 1366 (11th Cir. 1995); *Cardenas*, 895 F.2d at 1344.  Here, the text messages rebutted the suggestion that she was not familiar with drug trafficking and allowed the jury to infer that her involvement in the charged crimes was no mere accident or mistake.  And Colston's opioid offenses were temporally proximate to the charged conduct; the government only admitted messages from the ten days before her arrest.  *See United States v. Edouard*, 485 F.3d 1324, 1345–46 (11th Cir. 2007).  It follows that Colston's prior drug dealings were relevant to showing that she knew the package contained a controlled substance.

Moreover, the probative value of the evidence was not substantially outweighed by undue prejudice.  When evaluating a district court's ruling under Rule 403, we "view the evidence in the light most favorable to admission, maximizing its probative value and minimizing its undue prejudicial impact."  *United States v. LaFond*, 783 F.3d 1216, 1222 (11th Cir. 2015) (quotation

22

omitted).  The district court gave a limiting instruction three times to lessen the prejudicial impact of these messages, cautioning the jury not to consider the messages as evidence that Colston had a propensity to commit the charged crimes. *See id.*  We must presume that the jury followed that instruction.  *Id.*  So because of the probative value of the messages and the limiting instructions the court gave, we cannot say that Colston met the heavy burden of demonstrating an abuse of discretion.

*       *       *

The record is full of evidence that Colston and Pancho were up to no good, and that she knew the package she was so eager to pick up contained a controlled substance.  Whether or not the government understood it on appeal, that knowledge was enough to convict.  And in light of all the evidence of actual knowledge, the deliberate ignorance instruction was immaterial; our precedent shows that we presume the jury relied on the actual knowledge theory.  Our precedent also allows for the evidence of Colston's history of drug dealing.  For all those reasons, we **AFFIRM** Colston's convictions.