[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 23-10102

Non-Argument Calendar

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

JUAN CARLOS GARCIA,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 6:22-cr-00020-CEM-DAB-3

_____

Before WILLIAM PRYOR, Chief Judge, and WILSON and LUCK, Circuit Judges.

PER CURIAM:

Juan Garcia appeals his convictions for conspiring to possess with intent to distribute and possessing with intent to distribute 100 grams or more of a fentanyl analogue. 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), 846. Garcia argues that insufficient evidence supports his convictions and that the district court erred by failing *sua sponte* to instruct the jury on his defense of mere presence. We affirm.

A federal grand jury charged Garcia in a second superseding indictment with conspiring to possess with intent to distribute and possessing with intent to distribute a fentanyl analogue, *id.*, and possessing a firearm in furtherance of a drug-trafficking crime, 18 U.S.C. § 924(c)(1)(A)(i). At trial, Alejandro Coronado, an agent with the Drug Enforcement Administration, testified that a confidential source informed agents about a local drug trafficker named Alejandro Acevedo Luna. After the agents learned about an upcoming drug transaction in which Acevedo Luna would sell one kilogram of fentanyl for $33,000, they arranged a "buy bust" between Acevedo Luna and the source at a RaceTrac gas station.

Coronado testified that on January 5, 2022, the day of the transaction, agents saw Acevedo Luna leave his house in a black truck registered to his wife and driven by an unknown male, later identified as Garcia. Twenty-five minutes before the meeting time, Acevedo Luna called the confidential source and said that he was

in his truck, had the drugs with him, and would be at the gas station soon. Coronado explained that several other RaceTrac stores were closer to Acevedo Luna's house. Coronado saw Acevedo Luna and Garcia arrive and enter the gas station before returning to the truck and driving away. Around 12:30 p.m., the scheduled meeting time, police officers stopped the truck for speeding and identified Garcia as the driver. A K-9 unit detected narcotics in the truck, and agents found a loaded firearm in the center console. Garcia claimed that he owned the gun and had a license to carry it. Behind the front passenger seat where Acevedo Luna sat, agents found a black leather jacket wrapped around a white mailing envelope that contained a plastic-wrapped package holding 1,080 grams of fluorofentanyl. Coronado explained that this amount was consistent with high-level fentanyl trafficking.

At the police station, Acevedo Luna and Garcia consented to Coronado searching their cell phones, and the agent obtained a warrant to do so. On Acevedo Luna's cell phone, Coronado found a photograph of the plastic-wrapped fentanyl package. The photograph was sent to Acevedo Luna from Tecato Luis, later determined to be Luis Rosa Cotto, Acevedo Luna's supplier, on December 24. Coronado also found a video on Acevedo Luna's cell phone, which was published to the jury. The video was recorded the day before the arrests and showed a tattooed hand holding a white powder that was sealed in plastic wrap. A voice stated in Spanish, "Ready, cous'. I have it here at the house for you. So you can come by tomorrow whatever time you want." Coronado identified the hand as Garcia's and the voice as Acevedo Luna's. Coronado found

a similar video on Garcia's phone, in which Garcia held the same package and described its contents and value. Coronado concluded that based on the packaging information, the package in the videos was the same package found in the truck.

Acevedo Luna testified about his and Garcia's actions leading up to their arrests. Acevedo Luna had been involved in drug trafficking for over a year and had sold cocaine to Garcia, his friend. Acevedo Luna also worked as a distributor of chips, laundry detergent, and soap, but because he did not have a driver's license, he occasionally paid Garcia to drive him to deliveries. On the day of their arrests, Acevedo Luna had not told Garcia that they were delivering drugs. Regarding Garcia's awareness of the drugs, Acevedo Luna explained that although Garcia was present when Cotto dropped the drugs off at Acevedo Luna's house about two days before the arrests, Garcia never saw the drugs, nor did he ask about the package. Acevedo Luna paid Cotto $20,000 in cash. Regarding the video on his phone, Acevedo Luna explained that although he made the video, an individual named "Fernando," not Garcia, was holding the drugs. After the prosecutor asked several times whether Acevedo Luna was asked to tell the truth at trial, he insisted that his previous statement to the government—identifying the hand as Garcia's—was a lie.

Acevedo Luna continued telling the jury a story that differed from his previous statements. Acevedo Luna testified that on the day of their arrests, Garcia drove him to buy chips. After they unloaded the chips at Acevedo Luna's house, he told Garcia to drive

him somewhere, but Garcia did not know where they were going. They drove to the RaceTrac gas station, but the buyer changed the location of the deal to a Sam's Club. Because the new destination was on their way home, Garcia did not appear worried or ask questions. Acevedo Luna again denied telling the government a different story, including that he and Garcia discussed the transaction before getting in the truck, that Garcia insisted on going because he did not want Acevedo Luna to go alone, and that after the location changed Garcia asked why the buyer was "playing games."

Danny Garcia Pagan, a task force officer with the Administration, testified regarding his post-arrest interview with Garcia. In the interview, which was recorded and played for the jury, Garcia said that he and Acevedo Luna were acquaintances, and he had bought small amounts of cocaine and pills from Acevedo Luna. After unloading the chips at Acevedo Luna's house, Acevedo Luna suggested that they get pizza at the RaceTrac. But when they began to eat their pizza, Acevedo Luna suddenly said they should go home, after which they were stopped by police. Garcia initially denied that they were heading to a Sam's Club, but after further discussion with the agents, Garcia admitted that Acevedo Luna asked him to stop at a Sam's Club. Garcia also admitted that he photographed a white substance wrapped in plastic at Acevedo Luna's house the day before their arrests, but he was not sure if it was the same package found in the truck. He also admitted recording a video of the drugs because he was being "nosy" while Acevedo Luna was out of the room. Agents played Garcia's video during the interview, which showed his hand opening a mail envelope while

he said, "UPS came. I don't know, they—they brought me a package. I guess they made a mistake." He then removed the package and said, "D*mn. I got you," before knocking on the substance and saying, "It's rock."

In the interview, Garcia explained to agents that he thought the substance was cocaine and that he recorded the video as a joke because he was shocked by the "federal" quantity of drugs, which he estimated was worth $20,000. Garcia told the agents that he was the speaker and that they could tell it was his hands because of "the tattoos." Garcia said that Acevedo Luna was in the bathroom when he recorded the video, but Acevedo Luna returned and instructed Garcia to photograph Garcia's hands on the drugs. Garcia complied but warned him that "this is federal if you get caught." After Garcia's interview video concluded, Agent Garcia Pagan told the jury that Garcia changed his story several times, usually after being confronted with evidence from his cell phone. After this testimony, the district court reviewed the proposed jury instructions, and neither party objected to using the pattern instructions for conspiracy and possession offenses.

The government recalled Agent Coronado, who testified that Acevedo Luna's testimony was inconsistent with the information he provided before trial. Regarding the video found on Acevedo Luna's phone, Coronado determined that it was Garcia who held the drugs in that video because of the tattooed hand, which was the same tattooed hand in the video on Garcia's phone, and those videos were recorded two minutes apart.

Garcia moved for a judgment of acquittal. Fed. R. Crim. P. 29. Garcia argued that only Acevedo Luna could testify about whether Garcia knowingly participated in the attempted transaction and that Acevedo Luna instead testified that Garcia knew nothing about the drugs. Garcia also argued that there was no evidence of actual or constructive possession because the package was hidden in a jacket behind Acevedo Luna's seat, and the video was recorded on a different day. The district court denied the motion.

The district court then instructed the jury about finding a defendant guilty of a conspiracy as follows:

> A person may be a conspirator even without knowing all the details of the unlawful plan or the names and identities of all of the other alleged conspirators.
>
> If the defendant played only a minor part of the plan but had a general understanding of the unlawful purpose of the plan and willfully joined in the plan on at least one occasion that's sufficient for you to find the defendant guilty.
>
> But simply being present at the scene of an event or merely associating with certain people and discussing common goals and interests does not establish proof of a conspiracy. . . . Also a person who does not know about a conspiracy but happens to act in a way that advances some purpose of one does not automatically become a conspirator.

Garcia renewed his motion for a judgment of acquittal, *id.*, which the district court denied. The jury acquitted Garcia of the firearm charge and found him guilty of the remaining charges. The district court sentenced Garcia to 120 months of imprisonment.

We review the sufficiency of the evidence *de novo*, viewing "the evidence in the light most favorable to the government, with all inferences and credibility choices drawn in the government's favor." *United States v. Feldman*, 931 F.3d 1245, 1253, 1257 (11th Cir. 2019) (quotation marks omitted). The evidence will be sufficient to sustain a conviction unless "no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *United States v. Shabazz*, 887 F.3d 1204, 1221 (11th Cir. 2018). When a defendant fails to request a specific jury instruction or object to the district court omitting an instruction, we review for plain error. *See United States v. Pena*, 684 F.3d 1137, 1151 (11th Cir. 2012).

Garcia argues that the government failed to present sufficient evidence that he was aware of the conspiracy and that the district court erred by denying his motion for a judgment of acquittal. He contends that, apart from a couple of videos in which he allegedly held and described the drugs, there was no evidence that he had any part in the conspiracy. We disagree.

To convict Garcia, the government was required to prove by direct or circumstantial evidence that there was an agreement between two or more people to possess with the intent to distribute a controlled substance, that Garcia knew about the agreement, and that Garcia voluntarily joined the agreement. *See United States*

*v. Colston*, 4 F.4th 1179, 1187 (11th Cir. 2021). Because "[g]uilty knowledge can rarely be established directly," a jury "may infer knowledge based on circumstantial evidence." *Id.* at 1190 ("[I]f a defendant was instrumental to a plan's success, had ample opportunities to discover the critical fact, and was in frequent contact with someone who knew that fact, then a jury may be able to infer knowledge."). "False testimony after the fact also points toward a defendant's knowledge." *Id.*

Sufficient evidence supports Garcia's convictions. The government introduced evidence that Garcia drove a truck containing a kilogram of fluorofentanyl toward the location of a drug transaction that Acevedo Luna, who was his friend, drug dealer, and passenger, arranged. The government introduced evidence that Acevedo Luna told the buyer 25 minutes before the meeting that he had the drugs and was in the truck, which agents saw Garcia driving. The government played Garcia's recorded interview in which he explained that he and Acevedo Luna went to a RaceTrac store for pizza, but Coronado testified that several RaceTrac locations were closer to Acevedo Luna's house. And it was only after further questioning that Garcia admitted that Acevedo Luna asked to stop at a Sam's Club, which Garcia initially denied. The government also introduced evidence that, contrary to Acevedo Luna's testimony that Garcia knew nothing about the drugs, Garcia had photographed and recorded a video of himself holding the drugs. Moreover, the jury learned during Acevedo Luna's testimony that he told agents that Garcia not only knew about the drugs and the scheduled drug transaction, but that Garcia insisted on going with

him so he would not be alone. Acevedo Luna also told agents that after the location changed, Garcia asked him why the buyer was "playing games," further discrediting both Acevedo Luna's testimony and Garcia's defense theory that Garcia had no idea they were going to conduct a drug transaction. *See id.* Other circumstantial evidence, including Garcia telling agents that he estimated that the drugs were worth $20,000, the same amount that Acevedo Luna paid for the drugs, and the videos of the drugs being recorded on each of their phones just two minutes apart, further support the jury's findings.

Garcia also argues that the district court plainly erred by failing *sua sponte* to instruct the jury on his defense theory of mere presence, but we disagree. The district court properly instructed the jury on mere presence. Indeed, our pattern jury instructions for the offenses, which the parties affirmatively accepted and the district court read to the jury, instruct the jury that "simply being present at the scene" is insufficient to prove the defendant was involved in a conspiracy but that finding that he "played only a minor part of the plan" while having a "general understanding of the unlawful purpose of the plan and willfully join[ing] in the plan" is sufficient to convict. The instructions, which we presume the jury followed, substantially covered Garcia's defense theory of mere presence, so the district court did not err, plainly or otherwise. *See United States v. Almanzar*, 634 F.3d 1214, 1223 (11th Cir. 2011).

We **AFFIRM** Garcia's convictions and sentence.