[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 23-14068

Non-Argument Calendar

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

ROBERT DAMAINE SALTER,
a.k.a. Buddha,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Alabama
D.C. Docket No. 2:22-cr-00299-MHT-KFP-2

_____

Before ROSENBAUM, GRANT, and ABUDU, Circuit Judges.

PER CURIAM:

Robert Damaine Salter appeals his convictions, after trial, for conspiracy to possess with intent to distribute methamphetamine, fentanyl, cocaine, and heroin, 21 U.S.C. §§ 841(a)(1), 846; distribution of heroin, 21 U.S.C. § 841(a)(1); and possession of ammunition by a convicted felon, 18 U.S.C. § 922(g)(1). On appeal, Salter argues that the district court should have granted his motion for judgment of acquittal because there was insufficient evidence to support the jury's verdict. After careful consideration, we affirm.

## I.    FACTS AND PROCEDURAL HISTORY

In 2022, a grand jury charged Salter with one count of conspiracy to possess with intent to distribute fentanyl, cocaine, heroin, and 50 grams or more of methamphetamine hydrocholoride, 21 U.S.C. §§ 841(a)(1) & 846 ("Count One"), two counts of distribution of heroin, 21 U.S.C. § 841(a)(1) ("Count Three" and "Count Four"), and one count of possession of ammunition by a felon, 18 U.S.C. § 922(g)(1) ("Count Five"). Salter pleaded not guilty, and his case proceeded to trial. At trial,[1] the government moved to

---

[1] Before trial, Salter moved to suppress all evidence obtained as a result of a search of his residence. The district court denied that motion, and Salter does not argue that this was error on appeal, abandoning the issue. *See United States v. Cannon*, 987 F.3d 924, 939 (11th Cir. 2021) (explaining that an issue must be plainly and prominently raised to be considered on appeal). We note, however, that the argument that Salter's appointed counsel makes on appeal essentially mirrors the argument made in Salter's motion to suppress. We

dismiss Count Three, and the district court granted that motion. The government then began the presentation of evidence.

The government called Tyler Curlee, a detective with the Montgomery Police Department, who testified as follows. The police conducted two separate controlled drug buys through a confidential source, and the audio and video of each—as captured using a covert application installed on the source's phone—was published to the jury.

The video of the first controlled drug buy showed the source meeting Salter and following him into a residence. Once in the residence, the video showed Salter twisting a bag over a dresser, which had a clear cellophane-like material and white substance on top of it, and Salter later handed the bag to the source.

Before the second buy, the source called Salter and asked if Salter had any "brown," which Curlee testified referred to heroin. The video of the second buy shows the source entering a residence where Salter appears to be bagging something on top of a dresser—apparently the same dresser as in the video of the first buy—and then Salter appears to hand the source something off screen. Curlee testified that the police searched the source before both controlled buys to ensure that the source did not have any weapons or other money or narcotics on him; maintained constant visual surveillance of the source after he left the apartment in which the buy

_____

consider the merits of Salter's challenge to his conviction preserved but express some reservation about this briefing strategy.

took place; searched the source after the buy; and retrieved from the source a substance suspected to be heroin. Police brought the substances purchased during the controlled buys back to the police office, weighed them, and stored them in a temporary storage locker—which required a key card and alarm code to access—within a secure location in the building until the substances were turned over to task force officers with the Drug Enforcement Administration ("DEA").

On cross-examination, Curlee testified to the following. The police met with the source for about ten minutes prior to the first buy, during which the police performed a standard search on the source and his vehicle, which was a truck or van that the source drove for work. Curlee conceded that the searches of the source and his vehicle were not recorded. He also conceded that the video of the first buy showed baggies on top of a nightstand and a hand-to-hand transaction, but the subsequent search of the source was not captured on video. In the video published to the jury of the first controlled buy, suspected narcotics were in Salter's hand, which he handed to the source, and which Curlee testified were consistent with the bag received from the source.

The government also called Patricia Hill, an officer for the Montgomery Police Department assigned to the DEA High Intensity Drug Trafficking Area task force as a local officer assisting the DEA with drug investigations, who testified to the following. Law enforcement used a Title III investigation, or a wiretap, on Salter's cell phone from which the task force observed his phone calls and

text messages.  Over the course of 30 days, the task force recorded various phone calls and text message exchanges, which were published to the jury.  Hill identified the voices of Salter, Salter's co-conspirator Stacy Toney, the source, and Salter's girlfriend on the calls.

The first call published to the jury was an outgoing call made by Salter to the source who conducted the controlled buys.  The source asked if Salter was "going to get the clear" to which Salter replied "yeah."  Hill testified that "clear" is a term used for methamphetamine.  In another outgoing call to the source from Salter, the source asked for "a G of brown . . . and get some ice too," which Hill testified meant that the source requested a gram of heroin, and that "ice" is another term for methamphetamine.

In an incoming call, a third party asked if Salter had "seven zips" of "ice" to which Salter responded "yeah" and then Salter and the third party discussed cost.  Hill testified that a "zip" is an ounce, which equals 28 grams.  In an outgoing call from Salter to a third party, the two discussed "gray shit," which Hill testified refers to fentanyl.

In an outgoing call from Salter to Toney, Salter stated, "I got to get 7 ice cream cones," which Hill testified refers to 7 ounces of methamphetamine.  In another outgoing call, from Salter to Toney, Toney stated, "you got the two ounces of ice now" and later asked Salter if he wanted a "whole brick" or a "half brick." Hill testified that a "brick" refers to a kilo or 1,000 grams.  Later in the call, Salter asked about "cream" and told Toney "I need her"

and Hill testified that "cream" refers to methamphetamine and "her" could refer to cocaine, heroin, or fentanyl.

In an outgoing call from Salter to his girlfriend, Salter's girlfriend stated, "you gave me crystal," which Hill testified refers to methamphetamine, while Salter talked about "white stuff" and "gray," which Hill testified could refer to heroin, fentanyl, or cocaine. In the final call published to the jury, Salter told his girlfriend to "grab the crack out of it too" and referred to "crack rock," to which Hill testified that "crack" and "crack rock" both refer to crack cocaine.

The first incoming text message to Salter's phone published to the jury asked: "you got any more of the white ice," which Hill testified refers to methamphetamine. The responding message was an outgoing message from Salter that stated, "I got crack cocaine heroin and fit just ain't got no weed." Hill testified that "fit" refers to fentanyl and "weed" refers to marijuana. Another incoming text to Salter read, "I have 60 for the clear and 20 for the fent," and Hill testified that "clear" refers to methamphetamine and "fent" refers to fentanyl. In an outgoing text message, Salter stated, "open one of them white little bags and pour under one fourth of it in a corner," which Hill testified is how drug dealers package drugs, by putting drugs in the corner of a bag and twisting the bag. Hill also testified that this is what Salter was doing in the videos of the controlled buys which were published to the jury. The final text message published to the jury was an incoming message that read, "We need 2 points and some clear," and Hill testified that a

"point" is a unit of measurement for fentanyl or heroin with a tenth of a point being a dosage unit for the drugs.

On cross-examination, Hill testified to the following. A phone call between a man named Nathaniel Washington and Salter reflected that Washington wanted one and a half grams of methamphetamine. After that phone call, several officers and a canine conducted a traffic stop of Washington's vehicle and no narcotics were found; although Hill noted that one and a half grams is a very small amount that could have already been ingested. Hill also admitted that there was a weight discrepancy between some of his reports—Hill's report stated a drug weight of 235.8 grams and the laboratory's report stated a gross weight of around 50 grams and a net weight of 24.8 grams. Hill testified that the discrepancy was due to clerical error and her own "mistakes."

The government also called Stacy Toney, who was charged as a co-conspirator in this case with Salter. Toney identified Salter in the courtroom and testified to the following about his relationship with Salter, which spanned over 20 years. When the men were in their 30s, they began selling methamphetamine and fentanyl, in addition to marijuana. Toney would supply Salter with methamphetamine and fentanyl. During a phone call between Toney and Salter, Salter had stated, "I got to get seven ice cream cones" and that he had "bought two ice cream cones last time," and Toney testified that he had understood these comments to be a request for seven ounces of methamphetamine and a reference to his prior purchase of two ounces of methamphetamine. Toney's

understanding of the requested quantity was based, in part, on his prior sales of methamphetamine and fentanyl to Salter and his understanding that Salter was selling the drugs he received from him. Toney further explained that Salter's reference to a "a whole brick" and a "half brick" is either a kilogram (a whole brick) or a half-kilogram (a half brick) of methamphetamine. Toney confirmed that Salter's reference to "cream" was to methamphetamine and "her" was to fentanyl. Salter arranged buying a half-kilogram of methamphetamine and some fentanyl from Toney, but Toney did not fulfill that order. Toney identified Salter's voice in both calls.

The government also called Tyler Delashaw, a Task Force Officer at the DEA assigned through the Millbrook Police Department, who testified about a search executed at Salter's apartment—Apartment H—in a complex located in Montgomery, Alabama in June 2022. The search was executed by the Montgomery Police Department ("MPD"), the MPD Special Operations Division, and the MPD Narcotics Division, along with SWAT team members, case agents, and DEA staff. Salter was in the living room when the officers entered the residence, his driver's license was on top of a dresser in the master bedroom, and mail found at the residence was addressed to Salter. One bag found in the master bedroom contained narcotics. The bag also contained Salter's debit card as well as a black box which had various bags with white substances and a digital scale, photos of which were also published to the jury. On cross-examination, Delashaw testified that there was no body camera footage of the search as federal agents do not wear body

cameras. Delashaw further testified that marijuana, while found in the bag, was not found in the black box.

Hill also testified about her interview with Salter. Hill testified that she issued a *Miranda* warning,[2] and then began to question Salter in a recorded interview. The government published the interview to the jury and Hill identified Salter in the courtroom. During that interview, Salter admitted that there were different drugs in his residence, including crack cocaine and pills in the bag in his bedroom, as well as heroin, cocaine, and fentanyl. He had been selling the drugs to a few people. He also conceded that there was ammunition in his dresser—he explained that he once had owned a gun but did not anymore.

The government then presented several joint stipulations, which provided that the substances recovered were sent to the DEA lab in Miami and included total net weights of 1.978 grams of cocaine base (*i.e.*, crack cocaine), 3.988 grams of heroin, 24.8 grams of methamphetamine hydrochloride, 56.671 grams of fentanyl, and 4.3 grams of cocaine. As to Count Five, the parties also stipulated that Salter knew that he was a convicted felon and was prohibited from possessing a firearm or ammunition and that the relevant ammunition was manufactured outside of Alabama and, thus, affected interstate commerce by being present in Alabama.

Salter moved for judgment as a matter of law for an acquittal, but the district court denied the motion, stating "[t]he evidence

---

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

here is overwhelming." Salter declined to testify and renewed his motion for judgment of acquittal, and the court denied it again.

After deliberations, the jury found Salter guilty of Counts One, Four, and Five. Later, the district court sentenced Salter to a total sentence of 220 months' imprisonment, to be followed by five years of supervised release. Salter's appeal followed.

## II.    STANDARD OF REVIEW

"We review sufficiency of the evidence *de novo,* viewing the evidence in the light most favorable to the government and drawing all reasonable inferences and credibility choices in favor of the jury's verdict." *United States v. Trujillo*, 146 F.3d 838, 845 (11th Cir. 1998). "The relevant question in reviewing a sufficiency of the evidence claim is 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.* (emphasis in original) (quoting *United States v. Suba*, 132 F.3d 662, 671 (11th Cir. 1998)). A jury is "free to choose among reasonable constructions of the evidence" and "[t]he government need not disprove every hypothesis of innocence . . . ." *Suba*, 132 F.3d at 671-72.

"The test for sufficiency of evidence is identical regardless of whether the evidence is direct or circumstantial, and no distinction is to be made between the weight given to either direct or circumstantial evidence." *United States v. Guevara*, 894 F.3d 1301, 1307 (11th Cir. 2018) (quoting *United States v. Mieres-Borges*, 919 F.2d 652, 656-57 (11th Cir. 1990)). Still, "[w]hen the government relies on

circumstantial evidence, reasonable inferences, not mere specula-tion, must support the conviction." *United States v. Mendez*, 528 F.3d 811, 814 (11th Cir. 2008).

### III.    DISCUSSION

On appeal, Salter argues that the evidence presented was in-sufficient to support his convictions.[3] He contends that the drug evidence recovered from his home was "not properly evidenced in their purest form with body camera or properly photographed ex-hibits"—calling into question the validity of the search. He high-lighted a government exhibit which attributed to him 235.8 grams of methamphetamine when, he argues, there was not evidence substantiating that amount. He also asserts there was a lack of tan-gible evidence supporting any finding that the narcotics were found during the search of his home. Next, he argues that the gov-ernment's witnesses failed to establish that he was involved in the drug trade, as the video of him with the confidential source did not show him with any narcotics, nor did it show the source giving him money. He contends, in sum, that the government's case relied on speculation rather than reasonable inferences and, therefore, the district court should have acquitted him or granted him a new trial. In response, the government maintains the evidence against Salter was "overwhelming," and his conviction should be affirmed.

---

[3] On appeal, Salter does not challenge his sentence. *See Cannon*, 987 F.3d at 939 (explaining that issues not raised in initial briefs are considered aban-doned).

To convict a defendant of possession of controlled substances with intent to distribute, the government must establish three elements: (1) knowledge; (2) possession; and (3) intent to distribute.  *See* 21 U.S.C. § 841(a)(1); *United States v. Camacho*, 233 F.3d 1308, 1317 (11th Cir. 2000).  To convict a defendant for conspiracy to distribute controlled substances in violation of 21 U.S.C. § 846, the government must "prove beyond a reasonable doubt that (1) there was an agreement between two or more people to violate § 841(a)(1); (2) the defendant knew about the agreement; and (3) the defendant voluntarily joined the agreement."  *United States v. Colston*, 4 F.4th 1179, 1187 (11th Cir. 2021); *see also United States v. Reeves*, 742 F.3d 487, 497 (11th Cir. 2014) ("[W]here there are repeated transactions between participants buying and selling large quantities of illegal drugs, that may be sufficient to find the participants were involved in a single conspiracy to distribute those drugs.").

A defendant's mere presence at the scene of key events or association with a co-conspirator is insufficient to prove membership or involvement in the drug conspiracy, but presence may be a material or probative factor that the jury considers in reaching its decision.  *United States v. Miranda*, 425 F.3d 953, 959 (11th Cir. 2005).  "Guilty knowledge [of a drug conspiracy] can rarely be established directly," but a jury may infer knowledge, "[f]or example, if a defendant was instrumental to a plan's success, had ample opportunities to discover the critical fact, and was in frequent contact with someone who knew that fact . . . ."  *Colston*, 4 F.4th at 1190.  In light of this law, and reviewing the record, we conclude that the

evidence suffices. Law enforcement's search of Salter's home discovered methamphetamine, fentanyl, cocaine, and heroin. 21 U.S.C. § 841(a)(1); *Camacho*, 233 F.3d at 1317. The government also presented videos of two controlled buys that showed Salter packaging a white substance and handing it to a source; and Curlee testified that substance was narcotics. *Camacho*, 233 F.3d at 1317. Toney testified that he and Salter sold methamphetamine and fentanyl, and that he was Salter's supplier. *Colston*, 4 F.4th at 1187. The trial record also included phone call recordings and transcripts, as well as text messages, related to Salter's sale of methamphetamine, fentanyl, cocaine, and heroin. Hill and Toney testified that the subject matter of those phone calls and messages involved the purchasing of narcotics from Salter. *Id.* Further, in his post-*Miranda* interview, Salter admitted that there was crack cocaine, pills, heroin, and fentanyl in his residence, which he sold to a few people. *Id.*; *Camacho*, 233 F.3d at 1317.

Although Salter emphasizes that there was no body camera evidence of the search, Delashaw testified at trial that federal agents do not wear body cameras. However, "the jury [was] free to choose among the reasonable constructions of the evidence"—for instance by believing Delashaw's testimony. *Suba*, 132 F.3d at 671; *cf. United States v. White*, 569 F.2d 263, 265-66 (5th Cir. 1978) (explaining that "the mere possibility of a break in the chain does not render the physical evidence inadmissible, but raises the question of the weight to be accorded *by the jury* to the sufficiency of the

proof of a chain of custody" (emphasis added)).[4]   Accordingly, Salter's body camera argument does not show the evidence was insufficient.

As for the amount of methamphetamine attributed to him, Hill acknowledged that the 235.8 gram amount was a clerical error, and she testified that she played no role in determining the official weight of methamphetamine relevant to the case.   Thus, the jury could decide whether Hill was a credible witness.   *See United States v. Thompson*, 422 F.3d 1285, 1291 (11th Cir. 2005) (explaining that, "[f]or testimony to be considered incredible as a matter of law, 'it must be unbelievable on its face'" (quoting *United States v. Rivera*, 775 F.2d 1559, 1561 (11th Cir. 1985))).   There was also evidence of a phone call during which Salter sought to purchase seven ounces of methamphetamine and previously had purchased two ounces of methamphetamine, therefore supporting a jury finding that the conspiracy involved over 50 grams of methamphetamine.   *Id.*; *Guevara*, 894 F.3d at 1307; *Reeves*, 742 F.3d at 497.

As to Count Five, Salter admitted to possessing ammunition in his dresser, law enforcement found the ammunition in Salter's home next to his driver's license during the search, and Salter knew that, as a convicted felon, he was prohibited from possessing ammunition.   *See United States v. Green*, 873 F.3d 849, 852 (11th Cir. 2017); *United States v. Ochoa*, 941 F.3d 1074, 1105 (11th Cir. 2019);

---

[4] Fifth Circuit decisions handed down prior to October 1, 1981, are binding precedent in this Court.   *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (*en banc*).

23-14068              Opinion of the Court                    15

18 U.S.C. § 922(g)(1).  Therefore, we conclude there was sufficient evidence to support this conviction as well.  *Molina,* 443 F.3d at 829-30.

## IV.    CONCLUSION

For the reasons provided, we affirm Salter's convictions.

**AFFIRMED.**